## MINNEAPOLIS-SAINT PAUL SANITARY DISTRICT v. JOHN F. FITZPATRICK.[1]

December 24, 1937.

No. 31,306.

[1]Reported in 277 N. W. 394.

*Oscar Hallam* and *Bruce J. Broady,* for appellant.

*Doherty, Rumble, Butler, Sullivan & Mitchell* and *Lewis L. Anderson,* for respondent.

JULIUS J. OLSON, JUSTICE.

The Minneapolis-Saint Paul Sanitary District appeals from an order denying its motion for new trial.

The problem of sewage treatment and disposal in the cities of St. Paul and Minneapolis has been a matter of public concern over a period of years. The legislature, recognizing the necessity of concerted action by the two cities to correct or at least alleviate existing evils caused by lack of suitable and modern facilities to meet such conditions, enacted L. 1927, c. 181, creating the Metropolitan Drainage Commission. Amongst other things that commission was empowered (§ 5 of the act) "to study the subject of sewage disposal and treatment, to make surveys and collect data relating to the methods which might be used in disposing of such sewage or of treating the same so as to protect such watercourse from pollution, as well as any other watercourses or bodies of water lying within the drainage area of which such cities are a part. Said commission shall have power and authority to employ engineers, sanitary experts, and such other skilled or technically trained persons as it deems advisable, and shall have power and authority to employ the necessary clerical and office assistants, and to incur such other expenses as may be necessary to carry on its work." Pursuant to the quoted provisions, the commission made exhaustive examinations, investigations, and reports. Many sites in the vicinity of the two cities upon which it was thought practicable to construct a sewage treatment plant were investigated, and detailed studies of the availability and desirability of these sites and the probable relative costs were prepared.

By L. 1933, c. 341, as amended, 3 Mason Minn. St. 1936 Supp. §§ 1607-8 to 1607-30, provision was made for the creation of a corporate body to take in hand the construction and operation of a sewage disposal system and treatment plant for the two cities and some additional contiguous territory. In accordance therewith, petitioner was formed and since has been functioning under and pursuant to the authority so granted. By virtue thereof it was invested with the powers of a municipal corporation, including power, by condemnation or purchase, to acquire necessary right of way for

its sewage system and land upon which might be constructed and maintained a suitable and adequate sewage disposal and treatment plant.

Prior to the creation of petitioner the drainage commission had made extensive research in respect of matters pertaining to its functions. The details of these studies, surveys, and investigations were delivered to petitioner and by it adopted as far as deemed serviceable and advantageous. Based largely upon these, petitioner formulated and put into operation a thorough and comprehensive plan to bring about a solution of the problems for which it was brought into being. In addition to acquiring a right of way for its sanitary sewer, some nine miles in length, it also proceeded to acquire a site for its sewage disposal plant. A rather extensive area was needed to provide space for tanks, pumping equipment, an administration building, and other structures. A tract of land lying immediately north of the property here involved was purchased but more was needed. Apparently this could not be had by negotiations; hence petitioner proceeded by condemnation pursuant to 2 Mason Minn. St. 1927, c. 41 (§ 6537, *et seq.*) and thereby sought to acquire all of government lot 2, in section 9, township 28 north, range 22 west, owned by respondent, subject to a certain easement theretofore acquired by St. Paul Bridge & Terminal Railway Company, its easement being for right of way and other railroad purposes over the mentioned tract. The location of that line of railway left to the east thereof some 15 acres and to the west 47.55 acres, the latter area lying between the railway's right of way and the Mississippi River. Commissioners were appointed to appraise the damages for the taking. They duly qualified and proceeded to take testimony bearing upon the only question then remaining, *i. e.,* that of damages to the landowner. While that proceeding was in progress, petitioner, being of the view that it was not then necessary to acquire all of the lot, was permitted to discontinue the proceedings insofar as the 15-acre tract lying to the east of the right of way was concerned. It was permitted to amend its petition so that the only property directly involved in respect of physical taking is that portion of lot 2 which lies to the west of the right of way

extending westerly to the river, being the 47.55 acres sought and taken in these proceedings.

The involved property lies about three miles below the Robert street bridge, St. Paul, and locally bears the euphonious sobriquet of "Pig's Eye" or "Pig's Eye Island." Perhaps more than one-half of its area lies below the elevation of high-water mark as established by the federally built and maintained Mississippi River Improvement, generally referred to as the "Mississippi Nine-Foot Channel." The Hastings Dam, some 20 miles below St. Paul, was completed at the time the commissioners made their award. It is so constructed as to make the operating level at the highest point 689.1 sea level datum. As far as the record discloses, however, the present plans appear to call for pool level of 687.2 feet sea level datum. That matter, however, is not finally determined but ultimately must be decided by the federal government. At any rate, it is claimed by condemnor that much of the acreage must be raised by filling the lower lying portion to a sufficient height to bring it above the high-water level of the river.

The soil underlying the land sought is largely composed of "hard material" consisting of sand, gravel, and boulders underlain by sandstone. Not all of the land sought is so constituted, but there is no question that for the purposes sought by the condemnor it is the most suitable and economical site heretofore considered.

The land is uneven, and, as we have said, a large portion of it is below high-water levels. Buildings and other structures to be placed upon the property must be protected either by building a dike between the waters of the river in order to avoid high flood levels or the area must be filled so as to bring it above such levels.

The right of way of the terminal railway was acquired by condemnation proceedings had in 1909. Mr. Fitzpatrick was then the owner of all of government lot 2 and also a large acreage adjacent thereto. In that proceeding there was reserved for his use and that of his successors in title and interest a crossing over the railroad track at a point within 300 feet of the north line of the lot. Access to the river was retained respecting that part of his land lying to the south and southeast of the railroad right of way. Later,

in 1923, the railway company purchased from him a small strip of land to the east of the right of way, amounting to 62/100 of an acre for which he was paid a consideration of $600. The proof respecting this sale was objected to by petitioner but was received over such objection. That feature will be discussed later in our consideration of that phase of the case.

The commissioners on June 8, 1935, awarded the landowner damages in the amount of $30,718.75. Both parties to the controversy were dissatisfied with the result so reached, and as a consequence both appealed to the district court for a jury's determination of the extent of the damages that should be allowed the owner. In his notice of appeal the owner claimed compensation for the land actually taken at "a fair market value of $142,650.00"; and in·addition damages to 164 acres of land lying immediately to the west of the land taken in the amount of $30,000, that claim being based upon the alleged ground that he as the owner of this acreage was, by the taking, "deprived of Mississippi River frontage." Petitioner in its notice claimed that the award was "excessive, arbitrary, unreasonable and not warranted in law." The matter came before the court upon these cross appeals and was tried before a jury, which rendered a verdict in favor of the owner in the amount of $89,241.92, as compensation for the taking of the area of 47.55 acres, and an additional sum of $15,000 for damages resulting to the owner's remaining property, a total of $104,241.92. The only issue in the case is the amount of damages that should be paid the owner.

As the landowner, under our practice, occupies the position of plaintiff and has the right to open and close (2 Dunnell, Minn. Dig. [2 ed.] § 3111), we shall hereafter refer to him as plaintiff and to petitioner as defendant.

■ The issue presented is not new, nor is there anything strange about it. It has been passed upon and determined in numerous cases. The rules governing the question are so well stated by Mr. Justice Butler in Olson v. United States, 292 U. S. 246, 254, 255, 256, 257, 54 S. Ct. 704, 708, 78 L. ed. 1236, 1244,·1245, 1246, that we think it is quite appropriate to quote extensively therefrom:

"The judicial ascertainment of the amount that shall be paid to the owner of private property taken for public use through exertion of the sovereign power of eminent domain is always a matter of importance for, as said in Monongahela Nav. Co. v. United States, 148 U. S. 312, 324, 13 S. Ct. 622, 37 L. ed. 463, 467: 'In any society the fulness and sufficiency of the securities which surround the individual in the use and enjoyment of his property constitute one of the most certain tests of the character and value of the government.' The statement in that opinion (p. 326) that 'no private property shall be appropriated to public uses unless a full and exact equivalent for it be returned to the owner' aptly expresses the scope of the constitutional safeguard against the uncompensated taking or use of private property for public purposes. [Citing cases.]

"That equivalent is the market value of the property at the time of the taking contemporaneously paid in money. [Citing cases.] It may be more or less than the owner's investment. He may have acquired the property for less than its worth or he may have paid a speculative and exorbitant price. Its value may have changed substantially while held by him. The return yielded may have been greater or less than interest, taxes and other carrying charges. The public may not by any means confiscate the benefits, or be required to bear the burden, of the owner's bargain. * * *

"Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. * * * And, to the extent that probable demand by prospective purchasers or condemnors affects market value, it is to be taken into account. [Citing cases.] But the value to be ascertained does not include, and the

owner is not entitled to compensation for any element resulting subsequently to or because of the taking. Considerations that may not reasonably be held to affect market value are excluded. Value to the taker of a piece of land combined with other parcels for public use is not the measure of or a guide to the compensation to which the owner is entitled. * * * The determination [of value] is to be made in the light of all facts affecting the market value that are shown by the evidence taken in connection with those of such general notoriety as not to require proof. Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth. [Citing cases.]"

In addition to cited cases, see also 2 Lewis, Eminent Domain (3 ed.) § 706, and cases cited in notes; L. R. A. 1917A, 405 (annotation on "Prospective value of property as element of compensation in eminent domain"); Roberts v. New York City, 295 U. S. 264, 55 S. Ct. 689, 79 L. ed. 1429; McCandless v. United States, 298 U. S. 342, 56 S. Ct. 764, 80 L. ed. 1205.

No one will disagree with the foregoing principles, and we may therefore safely proceed directly to consideration of those assignments of error deemed essential to decision.

■ At the very outset of the trial plaintiff called for cross-examination under the statute defendant's assistant chief engineer. This man had been principal assistant engineer of the drainage commission. In that capacity he had investigated a number of sites thought to be suitable for a sewage treatment plant. In doing this work he had prepared reports and estimates of the cost of several sites so considered, including the one finally selected by defendant. As a part and portion thereof he therein set forth, as was his duty, his reasons for recommending this site in preference to others. One item of cost so considered, and it was made a highly important one

in this litigation, had to do with the cost of piling found to be necessary to furnish safe footing for the planned structures if any of the other sites were selected. The selected location was much better suited to the desired purpose because of this item. His testimony was made the basis, to a considerable extent at least, on the part of plaintiff's experts in fixing their estimates of damages.

The record is replete with questions such as these. "You made a calculation of the *sums to be saved*" by reason of piling not being required upon this property; "what did you mean in that report on p. 42" that the present location "is the *most economical* and location two would be *$230,000 more expensive?*" "*Saving,*" "*more economical,*" and "*how much more economical*" are phrases used throughout, as is also the expression "piling expenses" on other locations. Counsel in his argument to the jury spoke of "a saving of $270,000 by building on location one rather than on four or five other locations"; also that "$270,000 is not to be sneezed at"; that this sum is "an enormous saving"; that the engineer "thought it [the selected location] was $270,000 worth of piling better than any other land around it after three, four years of surveying." There is much more of the same type of testimony, clearly showing that this particular feature was emphasized again and again at the trial and was made much of by counsel in his closing argument to the jury. Defendant's motion to have this testimony stricken was denied, the court being of opinion that it was of evidentiary value as showing the "adaptability" of this property to the use sought by defendant, and likewise of similar advantage to any other purchaser who might desire such real estate for structures similar in type, weight, and needed space to the structures then being built by defendant.

If the theory contended for by plaintiff is sound it might well be that in some instances the necessities of the condemnor would become the owner's opportunity to exact a ransom. To illustrate: Let us suppose plaintiff held title to a narrow pass through a mountain range and that defendant sought a right of way through the pass, its only alternative if this were not available being to tunnel through solid rock formation, costing great sums of money.

Can it be said that the difference in the cost of tunneling through the mountain and what it would cost to build the road through the pass is to be the measure of the owner's compensation? The distinction between the supposed case and the present one is in degree only, not in principle. (Compare Union Depot, St. Ry. & T. Co. v. Brunswick, 31 Minn. 297, 299, 17 N. W. 626, 47 Am. R. 789.)

Nor do we think the cases cited by plaintiff in his brief, such as Rippe v. C. D. & M. R. Co. 23 Minn. 18; Conan v. City of Ely, 91 Minn. 127, 97 N. W. 737; Mississippi & Rum River Boom Co. v. Patterson, 98 U. S. 403, 25 L. ed. 206, and many others, sustain any such theory. Rather, we think, the rule is quite to the contrary. Thus in United States v. Chandler-Dunbar W. P. Co. 229 U. S. 53, 79, 33 S. Ct. 667, 678, 57 L. ed. 1063, the trial court had permitted damages for the taking of an island in St. Mary's River and included in the award a sum for its "strategic value with reference to any general scheme of water developments in the river." The Supreme Court in disallowing this claim said (229 U. S. 80):

"A 'strategic value' might be realized by a price fixed by the necessities of one person buying from another, free to sell or refuse as the price suited. But in a condemnation proceeding, the value of the property to the government for its particular use is not a criterion. The owner must be compensated for what is taken from him, but that is done when he is paid its fair market value for all available uses and purposes."

This also is the rule here. Thus in Stinson v. C. St. P. & M. Ry. Co. 27 Minn. 284, 291, 6 N. W. 784, 787, the court said:

"No reason can be given why property taken under the eminent domain by a railroad company, or for any public purpose, should be paid for at a rate exceeding its general value—that is to say, its value for any purpose. Any use for which it is available, or to which it is adapted, is an element to be taken into account in estimating its general value. But where a condemnation is sought for the purposes of a railroad, to single out from the elements of general value the value for the special purposes of such railroad, is in effect to put to a jury the question, what is the land worth to the

particular railroad company, rather than what is it worth in general? *The practical result would be to make the company's necessity the landowner's opportunity to get more than the real value of his land.*" (Italics supplied.)

The measure of damages as here sought and applied in substance and effect left with the jury the privilege of holding defendant to a higher rate of compensation than the actual value of the property taken. All the cases hold that this is not permissible. Rather and only the question is, What has the owner lost? not, What has the taker gained? Boston Chamber of Commerce v. City of Boston, 217 U. S. 189, 195, 30 S. Ct. 459, 460, 54 L. ed. 725, 727.

The entire record leaves no doubt in our minds that the effect of this testimony and argument to the jury was to open "wide the door to unlimited vagaries and speculations concerning problematical prices which might under possible contingencies be paid for the land," and to distract "the mind of the jury from the single question—that of market value—the highest sum which the property is worth to persons generally, purchasing in the open market in consideration of the land's adaptability for any proven use." Sacramento Southern R. Co. v. Heilbron, 156 Cal. 408, 412, 104 P. 979, 981. "The idea that a jury would naturally get from the admission" of this testimony would be that defendant *"should be made to pay" all it "could afford to pay rather than do without the property,* without reference to what it was fairly worth." (Italics supplied.) Union Depot, St. Ry. & T. Co. v. Brunswick, 31 Minn. 297, 299, 17 N. W. 626, 627, 47 Am. R. 789.

■ ▪Plaintiff was permitted to show that in 1923 he received from a railway company $600 for 62/100 of an acre, this parcel lying adjacent to the property here taken and similar to it except that in shape it was a strip purchased by the company to reduce a curve in its roadbed. And there was testimony of other sales, all submitted as substantive evidence of value as applied to the parcel here involved. Defendant has assigned the admission thereof as error.

In condemnation proceedings this court early adopted the rule that consideration paid for other property, even when adjacent to

the particular tract involved, is inadmissible as substantive proof of market value. In Stinson v. C. St. P. & M. Ry. Co. 27 Minn. 284, 6 N. W. 784, 786, this issue was squarely presented, the landowner there raising the issue. The trial court excluded the testimony, and this court sustained that ruling, saying (27 Minn. 289) :

"The objections to evidence of this kind are stated in East Pennsylvania Railroad v. Heister, 40 Pa. 53, where the court, speaking of similar evidence received in that case, says: 'It did not pretend to fix the market value of the land, but assumed to ascertain it by the special, and it may be exceptional, cases named. This will not do; for, if allowed, each special instance adduced on the one side must be permitted to be assailed, and its merits investigated, on the other; and thus would there be as many branching issues as instances, which, if numerous, would prolong the contest interminably. But even this is not the most serious objection. Such testimony does not disclose the public and general estimate which, in such cases, we have seen is a test of value. It would be as liable to be the result of fancy, caprice or folly as of sound judgment in regard to the intrinsic worth of the subject-matter of it, and consequently would prove nothing on the point to be investigated. The fact as to what one man may have sold or received for his property is certainly a collateral fact to an issue involving what another should receive, and, if in no way connected with it, proves nothing. It is therefore irrelevant, improper and dangerous.' See, also, Central Pacific R. Co. v. Pearson, 35 Cal. 247."

This rule has never been questioned since in this jurisdiction. On the contrary, in Board of Education v. Heywood Mfg. Co. 154 Minn. 486, 491, 492, 192 N. W. 102, 104, the court said:

"There is a great divergence of opinion as to the admissibility of evidence of this sort as substantive independent proof of value. 1 Wigmore, Ev. § 463; note to Hubbell v. Des Moines, Ann. Cas. 1916E, 598; 14 Col. Law Rev. 171. This court held in an early condemnation proceeding that only in exceptional cases where no other evidence could be had should a court permit the introduction of evidence of prices for which other property was sold as substantive

proof of the value of the property to be taken. Stinson v. Chicago, St. P. & M. Ry. Co. 27 Minn. 284, 6 N. W. 784. But, since no objection was made when respondent offered such evidence as part of its case in chief, and since the rest of it came in by way of cross-examination of appellant's witnesses, it was properly before the jury for their consideration."

This subject is ably discussed and many cases are cited in 2 Lewis, Eminent Domain (3 ed.) § 662. Particularly valuable are Hubbell v. City of Des Moines, 166 Iowa, 581, 147 N. W. 908, Ann. Cas. 1916E, 592, and Commission of Conservation v. Hane, 248 Mich. 473, 227 N. W. 718, 719, because of the thoroughness with which the question is considered and of the large number of cases reviewed. The Michigan case was decided in 1929, up to which time that court had not been committed to any rule on this subject. As such the court was free to choose the rule which from its investigation of decided cases was in its judgment most likely to promote the best result. The opinion recognizes that courts are "in disagreement" on the subject, and it makes no futile effort to harmonize the decisions, but concludes that the rule to be adopted "should be one of right and not of judicial discretion and general in its application." (248 Mich. 476.) It quotes with approval 2 Nichols, Eminent Domain (2 ed.) § 453, as follows:

" 'In states which do not allow the sale of similar lands to be introduced as evidence of value, he [the witness] may be questioned upon cross-examination in regard to such sales. His answers are not however evidence of the facts stated, and at best merely nullify his testimony.' "

The decisive holding is thus stated (248 Mich. 477) :

"We hold that knowledge of specific sales of property of similar character may be employed by a witness *in forming an opinion of the value of other lands equally circumstanced, but other specific sales of similar land and prices paid therefor may not be introduced as substantive evidence of the value of a particular parcel.*" (Italics supplied.)

See also Maxwell v. Iowa State Highway Comm. (Iowa) 271 N. W. 883.

We are therefore of opinion that the testimony here under discussion was improperly permitted to come into the case and was prejudicial. It was not put into the case on cross-examination as a test of knowledge upon which the expert based his opinion. As we have seen, there is a clear line of demarcation between substantive proof and proof which merely goes to "nullify his [the expert's] testimony." In so doing we are but confirming the position taken by this court in the Stinson case, decided more than 57 years ago.

Plaintiff claimed, and the jury, as we have seen, awarded him, damages for what is referred to in counsel's brief as "severance" damage, i. e., cutting off access to the river as to that part of his land lying beyond the portion condemned. Not only plaintiff, but likewise his experts, testified that there was a vast difference in the value of the remaining land after the condemnation, and that consequently damages should be had therefor in addition to damages awarded for the acreage actually taken. The value claimed for that area and consequent injury by reason of severance was put at very large figures, ranging all the way from $400 to $1,500 per acre. Plaintiff's testimony as to 20 acres thereof was at $1,500 per acre, 40 acres at $1,000, another 40 at $400, and lot 1, section 15, 34 acres at $600 per acre, in all amounting to more than $106,000. On cross-examination defendant offered to show that this land had not changed in respect of market value since 1911, when plaintiff sought and obtained a very material reduction in taxes upon his claim that "said lands are assessed at several times their value; the land lies very low and is overflowed every year, the Pig's Eye Slough flows over it and takes up a large part of the acreage." Its actual value was claimed to be $3,050. It had been valued by the taxing officers at $15,215. By reason of plaintiff's showing then made the valuation was reduced to $5,700. His application for such reduction, duly verified, was offered in evidence (exhibit 4) by defendant as a part of plaintiff's cross-examination. This is the identical property claimed by plaintiff at the trial to be worth more than $106,000. The offer was rejected as too remote in point of time, also because

proof of assessed value is incompetent on the subject of value of property when taken in condemnation. For defendant there was proof that this acreage had not materially changed in value since 1909, the year when the Bridge & Terminal Railway built through this lot.

Granting the validity of plaintiff's claim, that assessed value is not substantive proof of fair market value, that does not preclude proof of admissions made by the owner obviously at variance with his claims as now made. We think the proffered proof furnished by the exhibit was admissible as part of his cross-examination. There can be no doubt about its relevancy and materiality, at least to the extent that it goes to contradict plaintiff's present claims of value and consequent damage.

"Returns for taxation, being statements of the party to be affected under circumstances in which it is incumbent upon him to disclose the truth, are ordinarily regarded as admissions which may be received in evidence, even on the question of value." 22 C. J. p. 305, [§ 343] (6). See also 2 Nichols, Eminent Domain (2 ed.) § 458; Welton v. Iowa State Highway Comm. 211 Iowa, 625, 634, 233 N. W. 876, 882, and the many cases cited therein.

■ Severance damage as a separate element of compensation to be paid the owner is of importance in view of the large sum awarded by the jury therefor.

The general rule, and we think the one that should be applied here, assuming that only a part of a single tract is taken is well stated in 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 3052, as follows:

"He [the landowner] is entitled to the difference between the market value of the entire tract immediately before the taking and the market value of what is left after the taking, excluding from consideration general benefits, and deducting special benefits. But an owner is not entitled to receive compensation for the land actually taken, equal to its market value for a use or purpose wholly distinct from the use to which the remainder of the land is applied, and at the same time receive compensation for damages to such remainder."

Directly supporting the quoted language contained in the last sentence is Cameron v. C. M. & St. P. Ry. Co. 51 Minn. 153, 161, 53 N. W. 199, 202. There the landowner insisted that the land condemned was of special value as a gravel pit, and claimed compensation upon that basis. He also sought damages to the rest of his farm by reason of the taking. This court held:

"Assessing the damages by taking the value of the entire tract as a gravel pit, which of course assumed its separation from the remainder of respondent's land, and also assessing the damages by reason of its separation, was to some extent duplicating the damages. A new trial must be had."

And the same rule applies to plaintiff. He cannot take both claims as his basis for compensation, for by so doing he is but duplicating damages.

In this case we think the record presents a question of fact to be submitted to the jury as to whether the location of the railway company's right of way across plaintiff's property amounted in fact to a severance. The mere location of the right of way and the subsequent operation of the railroad thereon may not necessarily be considered a severance so as to divide the property into distinct lots or parcels. It has been held that a tract may be single though it is separated by highway or railway. 2 Dunnell, Minn. Dig. (2 ed.) § 3053, and cases cited under note 37; also that tracts may be distinct though they are near, and owned by an individual who uses the property as a farm. Id., and cases under note 38. Where tracts are *prima facie* distinct, the burden is on the owner to show them a single tract. Id., and cases under note 41. In our opinion, plaintiff's long use of this acreage for agricultural purposes, perhaps as a unit (although that may be uncertain upon the present record) furnishes sufficient ground for making this a jury issue. It will be for the jury to say, in view of all the facts and circumstances appearing upon the trial, whether there was in fact a prior severance by the location and construction of the railroad. If there was, that ends the severance question. If there was not, and the entire acreage constituted but a single tract and was so used, then but a

single verdict should be awarded for the entire damage for the land actually taken, including as well the harm resulting to the remainder because of the taking. 2 Lewis, Eminent Domain (3 ed.) § 694, and cases cited under note 67; as to benefits or damages to different tracts, see *Id.*, § 697; as to what constitutes an entire tract, see *Id.*, § 698.

■ The court in instructing the jury said, amongst other things:

"This land has been taken for a treatment of sewage and sewage disposal plant and that is a higher purpose than that of agriculture, and you are, therefore, directed to disregard all testimony as to values predicated solely upon the use of such land for agricultural purposes."

Defendant excepted to the instruction. The evidence strongly indicates, and the jury could so find, that the only use during plaintiff's long ownership of this property extending back more than 30 years· was an agricultural one. Where property is taken in condemnation the all-important question for the jury's determination is its market value, and this, as we have seen,. is to be determined by taking into consideration:

"The highest and most profitable use for which the property is *adaptable and needed or likely to be needed in the reasonably near future,* \* \* \* *not* necessarily as *the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held.* \* \* \* And, to the extent that probable demand by prospective purchasers or condemnors affects market value, it is to be taken into account." (Italics supplied.) Olson v. United States, 292 U. S. 246, 255, 54 S. Ct. 704, 708, 78 L. ed. 1236.

In the light of the record before us, we do not think it was proper for the court to pick out or designate any particular use as being more valuable than any other. That clearly was a fact issue to be determined by the jury in the light of all the evidence appearing upon the trial, guided by the instructions of the court. The taking and use of a part of plaintiff's farm as a sewage disposal plant can-

not as a matter of law be said to effect a change in its adaptability to that use alone, or to any particular purpose to the exclusion of others. We must bear in mind that the question is one of market value and that the damages to the owner "cannot be measured by the value of the property to the party condemning it, nor by its need of the particular property." 2 Lewis, Eminent Domain (3 ed.) § 706, p. 1231, and cases under note 99. And see also note and cases cited in McGovern v. City of New York, 46 L.R.A. (N.S.) 391, 392 (229 U. S. 363, 33 S. Ct. 876, 57 L. ed. 1228, where the writer sums up the rule thus:

"By the weight of authority, the value of property taken by eminent domain proceedings for the special purpose for which it is taken is not the basis on which the owner is entitled to be compensated. Its availability for that purpose, however, is an element to be considered in arriving at its market value, the market value being the true measure of compensation."

■ Defendant made timely request for an instruction that the burden of proof as to plaintiff's damages rested upon him. It was refused. We have already referred to the fact that the landowner occupies the position of plaintiff and as such has the right to open and close. Like any other action for recovery of damages, he who claims such has the burden of proving them. That, too, was plaintiff's situation. The question of damages going to him by the condemnation was the only question for the jury's consideration and determination.

This court in Minnesota Valley R. Co. v. Doran, 17 Minn. 162, 166 (188), where the same point was involved, said: "The analogy is perfect between this case and an action for unliquidated damages or breach of contract in which defendant claims a set-off by way of recoupment, * * * in which there could be no question that the affirmative of the issue was on the plaintiff," hence his right to open and close. See also 6 Dunnell, Minn. Dig. (2 ed.) § 9788; 2 Lewis, Eminent Domain (3 ed.) p. 1112, § 645; 2 Nichols, Eminent Domain (2 ed.) p. 1138, § 432.

■ Defendant also assigns as prejudicial error certain remarks of plaintiff's counsel in his closing argument. Particular stress is laid upon that portion thereof which relates to comment made by counsel with regard to evidence that the court had excluded. The court was unquestionably right and properly excluded the same. There is no claim otherwise. But whether it was or not is entirely beside the point. As an officer of the court, counsel owed a duty to the court to demean himself in such fashion as would leave the ruling of the court in full force. If a lawyer as an officer of the court may flout the court's rulings, especially where it relates to admissibility of evidence, what is to become of rules of conduct in general on the part of jurors, witnesses, and parties to causes being heard? What would become of the orderly manner of procedure if violation of the court's orders were permitted on the part of other court officers? If counsel deemed the court in error, the law provided his remedy. Counsel may not boldly suggest to the jury "the consideration of that which the court had kept out of the case." Burmeister v. Minneapolis St. Ry. Co. 185 Minn. 167, 168, 240 N. W. 359, 360; 6 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934, 1937) § 9799. Charity forbids further discussion of the question. It is indeed an unpleasant task to sit in judgment where misconduct of counsel may cause reversal, as it must if the result is reflected in verdicts rendered by juries. Sufficient for our purpose is to repeat in part what we said in the recent case of Krenik v. Westerman, 201 Minn. 255, 259, 275. N. W. 849, 851:

"If we are to have fair and impartial decisions, the emotions must not play a part in arriving at them. Emotion must not dominate or supersede reason. If it does, partiality results, and partiality in any branch of the government is but tyranny. The proper discharge of the functions of a jury is as essential to impartial justice as is the impartiality of the judge. Emotions and prejudices insofar as they are aroused in the jury poison what should be the clear and wholesome stream whose waters quench the thirst of the seeker for impartial justice."

462 

██ The verdict is challenged as excessive. The record points strongly in that direction. That this large recovery is traceable, in large part at least, to extravagant estimates of values furnished by plaintiff's experts, we think clearly appears. And that this was helped along by counsel's plea to the jury cannot be doubted. What plaintiff should receive and defendant pay is the "fair market value" of the property appropriated. What may be included therein has been, we hope, adequately pointed out.

The testimony of plaintiff's experts has for its foundation much "in the realm of possibility," very little if anything "shown to be reasonably probable." Mere speculation or conjecture must not be permitted to "become a guide for the ascertainment of value." It is "a thing to be condemned in business transactions as well as in judicial ascertainment of truth." Olson v. United States, 292 U. S. 246, 257, 54 S. Ct. 704, 78 L. ed. 1236.

There are many other errors assigned and argued by counsel. To discuss all of them (there being 99 in all) is impossible if there is to be a limit to this opinion, already much too long. Such other errors are, however, not likely to recur upon a retrial.

Order reversed.

MR. JUSTICE HILTON took no part in the consideration or decision of this case.

