STATE, BY J. A. A. BURNQUIST, ATTORNEY GENERAL, v.
JENS P. NELSON AND OTHERS.[1]

February 13, 1942.[2]

No. 32,970.

*J. A. A. Burnquist,* Attorney General, *Arthur Christofferson,*
Deputy Attorney General, and *Charles E. Houston,* Special Assist-
ant Attorney General, for appellant.

*E. A. Hauser,* for respondents.

LORING, JUSTICE.

The state appeals from an order denying a new trial in a trunk
highway condemnation proceeding. The principal question pre-

[1]Reported in 2 N. W. (2d) 572.

[2]Former opinion officially filed January 2, 1942, but not published, is
withdrawn, and this opinion substituted in its place.

sented is whether or not an option to purchase land designated and located for a trunk highway, taken by the commissioner of highways but never exercised, was admissible on the issue of damages for the taking of the land covered by the option.

Lots 17 and 18 of Allison's Second Addition to Sleepy Eye were a part of the estate left by Jens P. Nelson, who died some three years prior to the commencement of the condemnation proceedings here involved. His children, the respondents here, became the owners of their father's interest in the lots. Lot 18 is about 189 feet by 210 feet, lying to the north and across a 20-foot alley from lot 17, which lies 140 feet north and south along the proposed highway and was 70 feet wide (east and west) before the 20-foot strip here involved was taken from its east side by condemnation. December 11, 1939, the commissioner of highways, by order, designated a 20-foot strip to be taken off the east side of the lots for trunk highway No. 4 and on the same day he established a center line for the highway 40 feet east of the west boundary line of the 20-foot strip. December 20, 1939, the state, for a consideration of one dollar, obtained from respondents an option to purchase the 20-foot strip along both lots for $800. March 29, 1940, respondents sold all of lot 17 except the 20-foot strip to a person not a party to these proceedings.

April 22, 1940, the state filed a petition in the district court to take by condemnation the land here involved. Commissioners were appointed and the damages appraised. Their report was filed June 27, 1940, determining respondents' damages as owners of lots 17 and 18 to be $500. They appealed, and the jury awarded them $775 with interest from June 27, 1940.

1. On the trial the court admitted the option in evidence. We think its admission was prejudicial. An option is not a sale. Many considerations may enter into the purpose of acquiring an option, and unless it ripens into a sale it should not be admitted as evidence of value. Under our decisions, it is not even permissible to show the purchase price paid by the condemnor for property similar to that sought to be condemned in the vicinity

thereof. Stinson v. C. St. P. & M. Ry. Co. 27 Minn. 284, 6 N. W. 784; Minneapolis-St. Paul Sanitary District v. Fitzpatrick, 201 Minn. 442, 277 N. W. 394, 124 A. L. R. 897; see 2 Lewis, Eminent Domain (3 ed.) § 667, p. 1147.

By commencing the condemnation proceedings, the state in effect repudiated the option and disclaimed any rights thereunder. The only issue before the jury in these proceedings was the damage to respondents' property. There was evidence from which the jury could have found that respondents' damage was only $500. We cannot say that because the jury did not fix the damages at the amount of the option they were not influenced by it in reaching their verdict. Respondents' whole case was built up around the irrelevant option.

2. Damage to that part of lot 17 which was sold before the condemnation was started was not to be considered by the jury in assessing damages for the taking of the strip here involved. The purchaser of lot 17 less the 20 feet here involved was not a party to the appeal from the award, nor apparently was he a party to the proceedings. His part of lot 17 was segregated before these proceedings were started. He may or may not have been entitled to some form of relief if seasonably sought. Such being the case, the statement in this opinion that there was evidence that the damages to respondents did not exceed $500 rests on a firm foundation. Any contention to the contrary is based upon the misconception that the damage to the segregated part of lot 17 could be assessed to these respondents. That that view is a misconception will be seen when we realize that the award herein is no bar to recovery by the grantees of whatever damages the segregated part may suffer by the change of grade if relief for that be sought. Those grantees are not parties hereto.

The measure of damages herein was the difference in value before and after the taking of the tract consisting of lot 18 and the 20-foot strip of lot 17, but excluding that part of 17 which had been sold before the proceedings were started.

In fairness to respondents, the highway department might well have given them prompt notice of its determination not to take up the option.

There must be a new trial.

Order reversed.

HOLT, JUSTICE (dissenting).

I respectfully dissent to the conclusion that there should be a new trial. It is conceded that it was error to receive the option in evidence. But this resulted because the attorney who appeared for the state at the trial wrongfully, I think, sought to exclude evidence of damage or injury to the part of lot 17 sold to Ubl after the state acquired the option.

In my opinion, the legal proposition stated in the second part of the syllabus is not applicable to the facts in this case. The right of eminent domain given by Mason St. 1927, § 2554, authorizes the highway commissioner to take land for trunk highways by making and filing in his office two orders, one designating the center line and the other the width of the highway. Such orders were made and filed December 11, 1939, and certified duplicates thereof are in this record. In the orders, lots 17 and 18 were designated as land from which the east 20 feet was to be taken for the highway. Subd. 3 of said § 2554 contains this provision:

"No portion of the trunk highway system lying within the corporate limits of any borough, village or city shall be constructed, reconstructed or improved unless the plans and specifications therefor shall be approved by the governing body of such borough, village or city before such work is commenced, nor shall the grade of such portion of the trunk highway system lying within such corporate limits be changed without the consent of the governing body of such borough, village or city."

It is to be assumed that the city council of Sleepy Eye approved the plans and specifications for this highway on Lake street before the commissioner filed the orders of December 11 and before obtaining the option. The option expired June 1, 1940. Of course,

the commissioner need not exercise the option. He could abandon it and institute condemnation proceedings, and could have abandoned these before taking possession. He had the right to take possession under the option and also under the condemnation proceeding before compensation was paid or determined. Construction began in May. The commissioners to appraise the damage were appointed June 17, and their award filed June 27, 1940.

It seems to me that respondents had the absolute right, after this trunk highway had been located over parts of their two lots and the plans and specifications for the same had been approved by the city council of Sleepy Eye, to deal with their lots as they saw fit. They could have conveyed the whole or a part subject to the option or subject to whatever the highway commissioner might conclude to do, and agree with the purchaser as to who should receive what might come from the state either by the use of the option or by condemnation. Lot 17 was 140 feet north and south and 70 feet east and west. Had the south 50 feet been sold to Ubl instead of the west 50 feet, there could be no doubt of the propriety to include the damage to the whole of lot 17, in the award and in the verdict.

These two lots, though separated by an alley, had always been treated as one entire holding. The home of the parents of respondents had for many years been on lot 17. There respondents had been reared until they established homes of their own. Lot 18, an area sufficient to make four residence lots, had been used for garden and pasture. The petition to the district court, filed April 22, 1940, designated the lots as one tract owned by respondents, from which the east 20 feet was to be condemned. It stated that the orders of designation had theretofore been made. In the notice of hearing for the appointment of commissioners to appraise the damages, served and published, these two lots were designated as owned by respondents. The order made and filed June 17 appointed the commissioners to appraise the damages. In this order, as well as on the plat of the located highway, used on the trial and, no doubt, a duplicate of the plans and specifications approved

by the city council, the two lots in question are marked by the same number, to-wit, parcel 21. The commissioners' award of damages was of parcel 21, $500. So all the way through the proceeding the two lots were treated as one parcel.

It was not proper to let the jury know what the award of the appraisers was. But the state called the commissioners as witnesses of value or damage, and, having estimated such damage very low, cross-examination brought out what the award was, *viz.*, $500. It further disclosed that neither in their testimony as witnesses nor in the appraisal had they considered or given any damage for the injury to the west 50 feet of lot 17, because it had been sold by respondents. When the situation of these two lots is considered in respect to the construction of the highway, it is perfectly clear that damages for the injury to the west 50 feet of lot 17 should be paid by the state. The highway forms an embankment from 3 to $4\frac{1}{2}$ feet above the level of the lots. There is a public alley on the north side of lot 18, and the south boundary of lot 17 is Current street. This alley and street are filled in by the city to meet and connect with the grade of the highway. The slope of the ground of the two lots is to the east. The result from a heavy downpour of rain or melting snow will be a pond of water against the embankment. The house and foundation thereof on lot 17 will have to be raised at least three or four feet to make it livable, and the lot filled in. Had not the whole of lot 17 been included in the condemnation proceeding, there is no doubt that Ubl, the purchaser, could have intervened herein and had these damages assessed. State, by Benson, v. Stanley, 188 Minn. 390, 247 N. W. 509. There is nothing to the contrary in State, by Ervin, v. Appleton, 208 Minn. 436, 294 N. W. 418.

As stated, the state produced no witness, except the three appraisers as to damages. Each refused in his testimony to estimate any damage to the west 50 feet of lot 17, and testified that no damage therefor was included in the $500 award. Had that been done, there likely would have been no lawsuit or appeal, for the cost of raising the home on lot 17 would have increased the

award to more than the option, to say nothing of filling the lot. Respondents called as a witness one in the contracting business, who testified that it would cost not less than $1,250 to fill the two lots so as to be on grade with the highway. This testimony was not questioned or objected to.

It is plain that the error in receiving the option did not prejudice the state, for the verdict is less than the option.

I also think the majority are in error in suggesting that because Ubl is not a party or did not seek to become a party to the condemnation proceeding he may have a remedy because of the embankment of the highway. It is perfectly clear from this record that Ubl can assert no claim, for he admitted that whatever was to be paid by the state was to be received by respondents. Upon this condemnation record I think lots 17 and 18 should be considered as one parcel as therein designated, and damages awarded accordingly. This was accomplished by the trial had, and the order should be affirmed.

GALLAGHER, CHIEF JUSTICE (dissenting).

I concur in the dissent of Mr. Justice Holt.

JULIUS J. OLSON, JUSTICE (dissenting).

I am in complete accord with what Mr. Justice Holt has said in his dissent.