352 P.2d 343

STATE of Arizona, Appellant,

v.

James Lyle McDONALD and Ada McDon-
ald, his wife; First National Bank of
Holbrook, Arizona; R. E. Rockwell and
Irene Rockwell, his wife; Nyal G. Rock-
well and Helen O. Rockwell, his wife, Ap-
pellees.

No. 6638.

Supreme Court of Arizona.

May 18, 1960.

2

Wade Church, Atty. Gen. and Charles L. Hardy, Asst. Atty. Gen., for appellant.

Earl Platt, St. Johns, for appellees.

PORTER MURRY, Superior Court Judge.

This is an appeal by the State of Arizona (hereinafter termed the State or plaintiff) from a judgment in a condemnation suit wherein substantial damages were awarded to defendants-appellees, Rockwell and Mc-Donald, for properties condemned by the State for highway purposes. The case was tried to the court sitting with a jury. The defendants will either be referred to as such or, where necessary, by their surnames.

The basic facts are these: in the year 1955 the Arizona State Highway Commission took the necessary steps to relocate part of the existing Holbrook-Lupton Highway (U.S. 66, which is the heaviest travelled transcontinental highway in the State) and to acquire an enlarged right of way 255 feet in width. A portion of the highway crossed adjoining lands owned separately by these defendants. The road at this point runs at an angle from south-westerly to northeasterly.

The McDonalds had title to some 540 acres of practically unimproved land lying in sections 19 and 30, Twp. 19 North, Range 24 East, G. & S. R. B. & M., which had been acquired primarily for potential business sites. The property lies in Apache County just to the east of and adjacent to the Navajo-Apache county line. A segment of the scenic Painted Desert (which is part of the Petrified Forest National Monument) lies immediately to the north of said acreage. By easement dated October 18, 1954, the McDonalds granted to the State the requisite 255-foot right of way across their lands. The consideration for the 37.9 acres thereby taken was a nominal $10 per acre plus a vital concession by the State that McDonald should

have "two standard 30-foot turnouts * * * installed at the time of construction left of approximate Hwy.Eng.Sta. 4.00 and 7.00."

Defendants Rockwell owned some 200 acres to the east of the McDonald property lying in sections 19 and 20 (same township and range), upon which was then located a typical roadside business. By easement dated March 10, 1955, the Rockwells granted to the State a similar right of way across their lands. The primary consideration paid for the 11.1 acres taken was not the nominal ten dollars per acre but rather this proviso appearing in the easement, viz.:

"2. It is further understood and agreed that the following condition shall be met and installations made at the time of construction of the Holbrook-Lupton (Apache County Line—Crazy Creek Section) Highway, project F183 (26):

"1—30-foot standard turnout of approximate Highway Engineer's Station 69/50

"1—30-foot standard paved turnout of approximate Highway Engineer's Station 69/50

"1—30-foot standard paved turnout right of approximate Highway Engineer's Station 79/00 not to be scarified.

"The above mentioned turnouts to be joined to present pavement.

"Present pavement to be used for turnout at approximate Highway Engineer's Station 79/00."

With the passage by Congress of the "Highway Act of 1956", the road in question (U.S. 66) became a part of the National system of interstate defense highways. To conform to the standards therein prescribed this "Freeway" was to be constructed as a 314-foot, four-lane divided highway, with controlled access. This made it necessary that the State acquire an additional 59-foot strip of land from both defendants. The instant suit was filed, inter alia, to accomplish this purpose. In each instance the strip sought to be condemned lies "on the southerly side of, parallel and immediately adjacent to the right of way of the Holbrook-Lupton Highway as now established." Four parcels (Nos. 1, 2, 3 & 5) of the McDonald property—aggregating 8.40 acres—plus two parcels (Nos. 4 and 6) of the Rockwell property containing 3.64 acres, were included.

As to the Rockwells it is conceded this new construction will put them completely out of business, as the 59-foot strip not only obliterates practically all of the improvements of their roadside business, but hereafter they will not be able to get either on or off the highway, as there will not be a single gate along the 4,300 feet of their frontage on the south side or the 3,000 feet on the north side. Nor are any front-

age roads now planned in the area. Furthermore, Rockwells will be unable to directly cross over from one side of their holding to the other.

The McDonald property—with its two miles of frontage (counting both sides of the road)—will have one "ranch gate" on each side of the highway, the traffic over which is limited to five cars per day. (Such a gate, according to the plan, is installed every three miles.) The State's engineering testimony is that if any place of business were attempted to be served through said gates they would be immediately closed to all traffic. It is a part of the master highway plan that for a distance of 11½ miles—of which these properties are a part—there shall be no facility available for gas or food or a business of any kind.

The State's amended complaint sought not only to acquire the 59-foot strip but to wipe out "all access rights appurtenant and incident to the abutting parcels of lands." Counsel for the State, in his opening statement to the jury, very frankly admitted "the State was forced to revoke or to violate the agreement which had been made with these owners regarding these turn-outs * * *" and he conceded that the owners were entitled to compensation for the value of those access rights.

The jury returned separate unanimous verdicts, in favor of McDonalds for the sum of $14,250 and Rockwells $60,000. Judgment was thereupon entered against the State for such amounts. After denial of a motion for new trial, this appeal was taken.

The trial court correctly instructed the jury as to what constituted "fair market value", viz.:

"The measure of just compensation which must be paid to the defendants for the value of the portion of their land taken, and for the damage, if any, to the remaining portion, is fair market value.

"Fair market value is defined as the highest price estimated in terms of money which the property would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was adapted and for which it was capable.

"Market value is also defined as the price property would probably bring after fair and reasonable negotiations where the owner is willing to sell but not compelled to do so and the buyer is willing to purchase but is under no necessity of doing so."

The difficulty arose with both the State and defendants in establishing a yardstick of any bona fide comparable sales in the area. Defendant's witness Larry Burk, a realtor and appraiser from Phoenix, neatly expressed the problem: *"This is an area*

*where ownerships of property are large, distances are great, exchanges are few."* As a matter of fact there had been no sales in the immediate vicinity other than "the going-business sale" from the father, R. E. Rockwell, to his son Nyal Rockwell, infra. From the Navajo-Apache line east to Sanders (21 miles) during the period 1947–1955 there were just four recorded sales on this stretch of highway involving only land. Furthermore there were apparently only seven roadside businesses on U.S. 66 between Holbrook and Navajo, a distance of about 40 miles.

The principal assignments of error raise the question as to what evidence is material and relevant in condemnation proceedings in order to determine the value of land to be condemned. We shall discuss specifically some of the evidentiary problems presented

■ Over the objection of the State the court admitted in evidence the 1954 contract of sale between defendants R. E. Rockwell and his son Nyal of the identical property here involved; this included the 200 acres of patented land with improvements thereon and a "going business" consisting of a garage, filling station, restaurant, curios, bar, and dance floor. The contract price was $50,000, upon which a down payment of $10,500 was made, the balance payable at the rate of $200 per month, and at the time of trial there was a balance due of $31,700. The sale included a small stock of goods and a No. 7 & 9 liquor license, "together with the business and all of the good will thereof." It is this quoted phrase of the contract to which objection is specifically made. Admittedly there was lumped together therein both the realty and the "going business" under one price; furthermore it is conceded that at the time of sale the parties (father and son) did not separately evaluate the component parts thereof.

As clearly pointed out in the instruction above quoted, the measure of just compensation to the owner in a condemnation suit is the "fair market value" of the land taken. See, Mandl v. City of Phoenix, 41 Ariz. 351, 356, 18 P.2d 271. In the case of *State ex rel. La Prade v. Carrow,* 57 Ariz. 429, 114 P.2d 891, we stated:

"It is practically unanimously held that injury to a business is not property, within the meaning of the statutes relating to eminent domain, unless there is some express statutory provision allowing it, and that it is only damages to the real estate as such which may be considered." (57 Ariz. 433, 114 P.2d 893)

In addition thereto we also said,

" * * * Of course, if land is fit for some special purpose which enhances its value, that purpose may be taken into consideration in determining the value of the land itself, but not the injury to the business as such which

is conducted upon the land." (57 Ariz. 433–434, 114 P.2d 893)

The trial court was fully aware of these legal principles and in both the direct and cross examination of witnesses permitted wide latitude in establishing the "date of sale" value of various items of personalty from which the jury could, by subtraction, readily determine the contract price of the realty. While the contract standing alone with its lump sum price tag would have been prejudicial, we hold that under the circumstances here shown it was not misleading to the jury. Hence the trial court did not err in admitting the contract in evidence; particularly is this true where the jury was additionally instructed

> "that injury to a business is not property within the meaning of the statutes relating to eminent domain. It is only damage to the real estate and its improvements which may be considered."

The next assignment of error is concerned with the testimony of Charles H. Jacobs whose property was about two or three miles east of Rockwells, abutting on Highway 66. Jacobs was allowed to testify, over plaintiff's objection, concerning an option granted the United States Government Park Service. His testimony was to the effect that he granted the Park Service an option to purchase 920 acres for the sum of $75,000 and that later a quarter section was sold to them for $15,000 and the option renewed for the balance of his property. He further testified that his property was fairly similar to the property in question except that his would appraise higher than theirs. There was no effort made to qualify Jacobs as an expert on values nor did he testify as to the market value of the Rockwell property.

The State's objection to this testimony is (a) that an option to purchase real property is not material or relevant in proving the issue of market value, and (b) that a sale of real property to a body having the power to condemn is not relevant or material in proving the issue of market value.

The State cites one case only in support of their position as to (a) supra; State, by Burnquist v. Nelson, 212 Minn. 62, 2 N.W.2d 572, and none are cited by defendants. The Minnesota court, in reversing the lower court for its admission into evidence of an option to purchase, states: "An option is not a sale. Many considerations may enter into the purpose of acquiring an option, and unless it ripens into a sale it should not be admitted as evidence of value." (2 N.W.2d 573)

> "An option is a mere offer which binds the optionee to nothing and which he may or may not accept at his election, within the time specified." Hankey v. Employer's Casualty Co., Tex.Civ.App., 176 S.W.2d 357, 362.

**8**

We hold an option to purchase can be of no help to a jury in determining market value. It is readily apparent that there are too many contingencies involved in an option, where the optionee has no obligation to buy, to be of any worth in determining market value of real estate. It was therefore error to admit evidence of said option.

As has been noted, part of the Jacobs property was sold to the United States which has the power of eminent domain. The objection was raised as to the materiality of this testimony in determining market value. The court, in overruling the objection, expressed the view that it went to its weight rather than admissibility.

The majority view supports the proposition that the price paid by the same or another condemner for similar land, even if proceedings. have not been begun, is not admissible. Annotations 118 A.L.R. 893, 174 A.L.R. 395. However, later decisions take the position that the evidence in and of itself is not inadmissible if a proper preliminary showing can be made for its admission. Amory v. Commonwealth, 321 Mass. 240, 72 N.E.2d 549, 174 A.L.R. 370. For an excellent treatise on the subject, see Orgel on Valuation under Eminent Domain, 2d Ed., Vol. 1, § 147, page 615, et seq.

In Hannan v. United States, 76 U.S. App.D.C. 118, 131 F.2d 441, the court said:

" * * * [T]he burden is upon the party who offers such evidence to establish as a preliminary fact that the purchase, concerning which evidence is offered, was made without compulsion, coercion or compromise." (131 F.2d 442.)

We fail to see why evidence of such a sale should be kept from the jury simply because the purchaser has the power to condemn, subject of course to the trial court's sound discretion as to its probative value, and subject to a proper foundation having been laid for its admission, in conformity with the rule laid down for market value in Mandl v. City of Phoenix, supra, and in Hannan v. United States, supra. We have examined the transcript of Jacobs' testimony and fail to find any preliminary evidence by the defendant that would justify the admission into evidence of the sale from Jacobs to the Park Service. There is no showing that the sale was voluntary, that the owner was willing to sell but not compelled to do so, that the buyer was willing to buy but under no necessity of buying the property. There was nothing from which a lack of compulsion, coercion, or compromise could be inferred. Since in any event the burden was on the defendant to establish a foundation for the admission of such evidence, we hold it was error to admit evidence of the sale to the government.

It is contended that the trial court erred in admitting into evidence the testimony of the witness J. Leslie Hansen as to what he had heard the State of Arizona had paid in settling with Dowdy, for the reason: the amount that the State of Arizona pays to a neighboring property owner for property is neither material nor relevant in proving the market value of other property.

The testimony giving cause for this contention arose on cross examination. Hansen was asked whether or not the Dowdy property had been recently sold and he testified that he understood "Mr. Dowdy has settled with the State Highway Department." He was then asked at what figure and an objection was made. The objection was overruled and Hansen testified that the figure was $30,000. We have held, supra, that evidence of the price paid by the same or another condemner for similar land without a proper foundation is inadmissible.

The State next assigns as error the admission into evidence of "an offer to purchase" real property. It appears Ernest Wesson, over the objection of the State, was allowed to testify that he had offered to purchase the Rockwell property in 1954 for $75,000, and that Rockwell had refused the offer because he had already made a deal with his son and could do nothing about it. On cross examination Wesson testified "that he did not have that amount of money."

Not having decided this question in Arizona, we must go to recognized authorities and decisions from other jurisdictions for our guidance. The majority of the cases hold that such evidence as to mere unaccepted offers to purchase are not admissible upon the issue of market value of real property. See Annotation, 7 A.L.R. 2d 785.

Orgel, the recognized authority on Valuation under Eminent Domain, supra, states (§ 148):

"Offers to buy or sell property are treated as an inferior type of sales evidence. Their inferiority is attributed partly to the fact that they represent at best the opinion of one party rather than of two and partly to the difficulty of establishing their bona fide character. As a rule, therefore, they have been held inadmissible except as admissions against the owner.

. "In discussing in detail the rulings of the courts, we must distinguish offers relating to property taken from offers relating to property not taken and with respect to both types of property, we must differentiate offers by the owner to sell from offers of third parties to buy. The courts have generally held that evidence of offers to

buy property other than that taken may not be admitted. * * *"

In Illinois the courts have followed the minority view and admitted under limited circumstances "offers to purchase" as evidence of market value—particularly where there have been few, if any, actual sales of similar properties in the vicinity. But the courts admitting such evidence have been extremely careful in requiring that the offer be a bona fide one.

"* * * The offer must be made in good faith, by a man of good judgment, acquainted with the value of the real estate and of sufficient ability to pay. It must be for cash and not for credit or in exchange and it must be determined whether made with reference to the fair cash market value of the property or to supply a particular need or fancy. Private offers can be multiplied to any extent, for the purpose of the cause, and the bad faith in which they were made would be difficult to prove. The reception of this kind of evidence stands upon an entirely different footing from evidence of actual sales between individuals or by public auction. The question of admission is one involving the discretion of the court and the decision of the court will not be disturbed unless it is manifestly against the weight of the evidence. The burden is upon the party seeking to have such evidence admitted to establish a sufficient foundation by showing that the offer was *bona fide*, for cash, and made by a person able to comply with the offer if it were accepted. * * *" City of Chicago v. Harrison-Halsted Building Corp., 11 Ill.2d 431, 143 N.E.2d 40, 45.

It will be noted that the offer by Wesson did not meet these requirements. There was no showing that it was a bona fide offer, in fact he stated it was not a cash offer, that he didn't have that much money. It was therefore error to admit Wesson's testimony.

■ To what extent trades or exchanges of property are relevant or material in proving market value is the next question posed for our consideration. The factual basis out of which this question arises is: Cody O. Harris, a motel and curio store operator on Highway 66, was called as a defense witness. He testified that his place of business originally was at the "*old Navajo Station*", adjacent to the railroad, by which the main highway then ran. With the realignment, Highway 66 was moved several miles north and it became necessary—if he was to stay in business—for him to move up onto the new highway. In the year 1955 he purchased from his cattleman friend and neighbor R. C. Spurlock, 7.58 acres of land adjoining Highway 66 upon which he built

a new place of business. The recorded deed recited a consideration of $2,500 and the attached revenue stamps bore out this value. Every witness testifying as to values of the McDonald and Rockwell property used this as a comparable sale. Without objection Harris also testified that as a part of the consideration for said land they had a "gentlemen's oral agreement" whereby Spurlock was given "an option", which as yet had not been exercised, to pick up the old store building and a well thereon which he considered worth at least $4,500, thus making the actual consideration paid for the land acquired from Spurlock some $7,000.

At the conclusion of Harris' examination the State moved to strike the testimony as to the "swap" or "option", which motion was taken under advisement and never ruled upon. Furthermore, in instructing the jury the court refused to give plaintiff's instruction No. 25, which read:

> "To render evidence of sales competent, they must be for money and not, in whole or in part, by way of exchange."

This refusal is also assigned as error.

We agree with the State's contention that "swaps" or trades and exchanges of property are not material or relevant in proving market value. In Hay v. Boggs, 77 Wash. 329, 137 P. 474, the Washington court in dealing with a valuation question similar to the one at bar stated:

> " * * * This is not sufficient evidence of value for us to find what the real value was, which is what appellant is entitled to, not a fictitious value fixed by the parties upon their respective lands in effecting an exchange. We think we may rightfully assume that such a value is ofttimes far from the real value. * * *" (137 P. 475.)

Jackson v. Raisor, Ky., 248 S.W.2d 905, substantiates this view.

We hold upon this record that the court erred in not striking the Harris testimony as to the "swap" or trade with Spurlock, and that hence the requested instruction, supra, should have been given.

Another objection by the State is that the trial court erred in permitting the witness, Joe Linnane, to testify as to his opinion of the value of the subject properties for the reason that he was not properly qualified to give such an opinion.

Mr. Linnane was an accountant who lived at Sanders about 30 miles east of the condemned properties. He had lived in the vicinity for 20 years. He did accounting work for about fifty per cent or sixty per cent of the businesses along the highway in question, although he did no work for the defendants. He was Chairman of the Board of Supervisors of

Apache County. While not an expert appraiser he had in times past made appraisals for individuals, banks, and the United States Government. He knew from his work the value of improvements, the net and gross incomes from and the values of similar businesses and properties along the road.

We held, in Board of Regents of University, etc. v. Cannon, 86 Ariz. 176, 342 P.2d 207, that a layman so qualified might, in the discretion of the trial court, be allowed to offer his opinion as an expert.

In Mai v. Garden City, 177 Kan. 179, 277 P.2d 636, this statement appears:

"* * * Opinion evidence is also usually admitted from persons who are not strictly experts, but who from residing and doing business in the vicinity have familiarized themselves with land values. The competency of such witnesses is primarily for the court, and the weight to be given such testimony is for the jury. 18 Am.Jur. 999, § 355." (277 P.2d 639.)

To the same effect see, State v. Peterson, 134 Mont. 52, 328 P.2d 617, 623. Also Annotation appearing in 159 A.L.R. 11.

We hold that the trial court did not abuse its discretion or err in admitting the testimony of Mr. Linnane, as he appears to have had peculiar means of forming an intelligent judgment as to the value of the property in question, beyond what is presumed to be possessed by men generally, even though he was not a technical expert.

The State also assigns as error the trial court's refusal to give its proposed instruction No. 17, the basic premise of which reads:

"Where a new controlled-access highway is established in an area where no highway previously existed, there is no taking of an easement of access, because such an easement has never in fact existed. * * *."

While as an abstract proposition this correctly states the law, we not believe it is applicable in the instant situation. It appears that in their effort to invoke this principle counsel have misconstrued and misapplied the facts, as this is certainly not a new area or location. As heretofore pointed out, in granting the 1954–1955 easements defendants specifically obtained vital concessions from the State of Arizona that are fully set forth in the easements. These easements provided for that access to defendants' properties which was reasonable under the circumstances and which would not interfere with the highest and best use of the land. By the proposed changes in the highway, defendants will be absolutely deprived of this vested right to ingress and egress. Such a deprivation is compensable. State ex· rel. Morrison v. Thelberg (second opinion), 87 Ariz 318, 350 P.2d 988, and Pima County v. Bilby,

87 Ariz. ——, 351 P.2d 647. This lengthy instruction as submitted was properly refused.

It would unduly extend this already lengthy opinion to treat all of the other claimed errors that are raised by the State. Suffice it to say that we have carefully considered each of said assignments and find them to be without merit.

 There is still another matter to be determined. At the trial it was stipulated that the question of fees and expenses of expert witnesses was a matter, both of fact and law, to be determined by the court. A cost bill totalling $1,375.50 was eventually filed by defendants; the State made its objections thereto. The matter was fully briefed and by a separate order the court allowed said cost bill en toto. From this order the State has appealed.

The statute on eminent domain (A.R.S. § 12–1128) provides:

"A. Costs may be allowed or not, and if allowed may be apportioned between the parties on the same or adverse sides, in the discretion of the court."

Rule 54(f), Rules of Civil Procedure, 16 A.R.S., reads:

"* * * Costs against the state, its officers, and agencies shall be imposed only to the extent permitted by law. * * *."

A.R.S. § 12–332 enumerates the taxable costs and includes "Fees of officers and witnesses." But no provision is made for expert witnesses. The amounts of witness fees are provided for in A.R.S. § 12–303, i. e., one dollar and fifty cents per day plus fifteen cents for each mile traveled.

Defendants take the position under the Constitution, that unless the defendants are allowed their cost for expert witnesses they cannot be justly compensated. Article 2, § 17, provides in part:

"* * * No private property shall be taken or damaged for public or private use without just compensation having first been made, * * *."

At first glance there appears to be a split of authority on the question here involved. But after a careful reading of the cases, it becomes apparent that those courts allowing costs for expert witnesses concern themselves with the interpretation of their given statutes. East Baton Rouge Parish School Board v. Ford, La.App., 76 So.2d 20; Westwego Canal & Terminal Co., Inc. v. Louisiana Highway Commission, 200 La. 990, 9 So.2d 389; Dade County v. Brigham, Fla., 47 So.2d 602, 18 A.L.R. 2d 1221.

Although it would appear some courts have taken the view that a denial of an allowance for witness fees would violate the constitutional guarantee of "just compensation" they have actually done so

**14**

through interpretation of statutes differing from ours.

A.R.S. § 12–1128 was adopted from California. A 1927 California case held that this section (West's Ann.Cal.Code Civ. Proc. § 1255) meant the usual costs attending trial allowed by statute. City of Los Angeles v. Vickers, 81 Cal.App. 737, 254 P. 687. People v. Bowman, 173 Cal. App.2d 416, 343 P.2d 267, cites the above case and restates the same position, i. e., that fees paid by a landowner for an expert appraiser in condemnation cases are not allowable.

The Vickers case, supra, stated that "just compensation"

" '* * * has reference to the value of the property taken and the damage to property not taken, and nothing more.' "

Although we are not bound to follow the interpretation placed on a statute by a state from which our statute was adopted, it is persuasive. Town of Williams v. Perrin, 70 Ariz. 157, 217 P.2d 918. Whether a trial court may allow the fees of an expert witness in an action such as this as costs of suit is a matter of first impression in this court. However, being mindful of the decisions herein cited, we hold that the word "cost" has been limited in its meaning by A.R.S. § 12–332, wherein no provision was made for the allowance of expert witness fees. Should it be deemed advisable to effect a change in the law, we believe it should be done by the legislature and not by judicial fiat.

The order allowing expert witness fees is set aside.

The judgment is reversed, with directions to grant a new trial.

STRUCKMEYER, C. J., and UDALL, JOHNSON and BERNSTEIN, JJ., concur.

NOTE: PHELPS, J., having announced his disqualification, the Honorable PORTER MURRY, Judge of Superior Court, Greenlee County, was called to sit in his stead.