[Civil No. 3209. Filed January 16, 1933.]

[18 Pac. (2d) 271.]

ZALI MANDL, Appellant, v. CITY OF PHOENIX, a Municipal Corporation, Appellee.

Mr. Arnold Mandl and Messrs. Kibbey, Bennett, Gust, Smith & Rosenfeld, for Appellant.

Mr. L. C. McNabb, for Appellee.

ROSS, C. J.—This is a proceeding by the city of Phoenix to condemn 40 acres of 120. acres of Zali Mandl's land for a reservoir site to be used in connection with the city's waterworks system. There is no dispute that the use for which the land is sought is public; that its locality is suitable and necessary for the city's purposes. Only the ascertainment of the value of the 40 acres taken and the damages accruing to the uncondemned parcel is left for determination. These issues were twice submitted to juries. On the first trial the verdict was for $14,000, but this verdict was set aside and a new trial ordered because the court was of the opinion that error had been committed in not instructing the jury to consider the suitability of the land for subdivision and sale for high-class desert home sites. On the second trial the verdict was for $12,000 for the value of the 40 acres taken and $500 for damages to the adjoining 80 acres. The evidence at both trials was practically

the same, but the error for which a new trial was granted was corrected in the second trial. Upon the last verdict, judgment was entered condemning the 40 acres upon condition that plaintiff deposit in court the sum of $12,500, with interest at six per cent. per annum from December 30, 1930, until paid, and the costs taxed at $63.30. The appeal is from this judgment.

The land taken and the land not taken consists of three legal subdivisions of 40 acres each, three-quarters of a mile long. The condemned 40 is the easterly one. It is all desert in character, and higher than the cultivated areas in the neighborhood. It has no water rights, and is not susceptible to irrigation by gravity. All of the evidence was to the effect that its character, its location, setting and surroundings made it very desirable for high-class desert homes. The expert testimony of defendant placed the value at $1,000 to $1,500 per acre, if subdivided and platted into lots or estates and sold on partial payment plan with a reasonable down payment and the balance in deferred payments. These same witnesses placed the value of the two untaken 40's at $1,000 per acre, and estimated the damages thereto to be from thirty to fifty per cent. of their value. The testimony of plaintiff's experts placed the cash or market value of the 40 acres taken at from $50 to $400 and the damages to the rest as nothing.

The defendant claims the court erred in instructing the jury upon the question of the value of the land taken, such instruction being as follows: "The first question to determine, as I have said, is the actual value of the forty acres to be taken upon which they propose to build reservoirs. The actual value as of December 18th, 1930, and by actual value is meant in law the market value, and that is what you are to find. What is the market value of that forty acres

as of December 18th, 1930? In determining the market value you are not to consider the price at which the property would sell for under special or extraordinary circumstances, but are to determine its value if sold in the market under ordinary circumstances for cash, and assuming that the owners are willing to sell and the purchaser is willing to buy. . . . The test is its fair market value if offered in the market under ordinary circumstances for cash and a reasonable time being given to make the sale. Market value is the amount which the property would sell for if put upon the open market and sold in the manner in which property is ordinarily sold for cash in the community where it is situated, with a reasonable time being given to find a purchaser to whom to make the sale'' and in refusing to give to the jury her requested instruction that ''you are not limited to sales for cash, but may consider what the property would bring if sold for a reasonable payment in cash with the balance payable on reasonable time payments.''

Defendant also complains of the court's ruling permitting the plaintiff, over her objection, to ask her witnesses on cross-examination the cash price or value of the land taken, the objection being that defendant did not have to accept or take a cash price, but was entitled to a price obtainable when sold on reasonable terms as to time and payments.

The objections to the evidence and the requested instruction fully and completely bring into view the defendant's contentions as set forth in her assignments.

The first criticism of the court's instruction is that it required the compensation to be in cash. We understand that this is directed at both the medium of payment and the time or times of payment. The state Constitution provides that:

"No private property shall be taken or damaged for public or private use without just compensation having been first made, or paid into court for the owner." Section 17, art. 2.

Section 1337, Revised Code of 1928, provides for money to be paid into court to secure or compensate the owner of property taken or damaged. These provisions of our law clearly contemplate compensation to the owner in money at the time or before his property is taken. It is said in 20 Corpus Juris 842, section 278:

"The great weight of authority is to the effect that payment for property taken under the power of eminent domain must be made in money in the absence of an agreement to the contrary. . . . The landowner cannot be compelled to accept in payment other lands, or a grant of a right of way over adjoining land. Nor can he be required to accept the bonds of the condemning corporation, or scrip, or improvement certificates. . . . "

The medium of payment of compensation is ready money or cash. The condemnor cannot compel the owner to accept anything but money, nor can the owner compel or require the condemnor to pay him on any other basis than the value of the property in money at the time and in the manner prescribed by the Constitution and the statutes. When the power of eminent domain is resorted to, there must be a standard medium of payment, binding upon both parties, and the law has fixed that standard as money or cash.

Part cash and deferred payments are not and cannot, in the nature of things, be regarded as a reliable and constant standard of compensation. The attractiveness or desirability of a sale on terms would depend upon too many uncertain factors, such as the price, whether the actual value or the speculative value, the honesty and financial ability of the pur-

chaser, the percentage the down payment bears to the agreed price, and the kind of security, whether personal promise of the purchaser, or the land, or collateral. The actual value of the land is not what might be realized on a campaign of high-powered salesmanship after the land is subdivided into lots or estates, but what it would bring; "that is to say, the highest price estimated in terms of money which the land would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was adapted and for which it was capable." *Sacramento Southern R. Co.* v. *Heilbron,* 156 Cal. 408, 104 Pac. 979.

The defendant cites as upholding her contention *St. Louis, K. & A. Ry. Co.* v. *Chapman,* 38 Kan. 307, 16 Pac. 695, 5 Am. St. Rep. 744, and *Matter of City of Buffalo (New Reservoir),* Sheldon (N. Y.) 408. In the first case, upon the assumption that the evidence failed to show the property taken had a market value, the jury was instructed to "consider its reasonable worth in the hands of a prudent seller, at liberty to sell, at a reasonable time for selling, and usual and reasonable terms and conditions of sale." The appellate court, in commenting upon the instructions from which the above is taken, said:

"In these instructions we see no error. It was a direction to the jury to determine the market value of the property, in the first instance, and, if they found that there was no market value at the time the property was so taken and condemned, then they might consider the evidence of the reasonable worth of the same in the hands of a prudent seller, or a person desiring to purchase. . . . "

In the court's restatement of the instruction, the phrase "the usual and reasonable terms and conditions of sale" is not referred to. In its *résumé* of

the evidence it is not mentioned. It was, so far as the facts are concerned, a mere abstract statement, and was evidently so treated by the court. At all events, we think the price for which property is or may be sold on terms and conditions is not the actual or market value as that term is understood in the law of eminent domain. The New York case is not in the state library, and we have not seen it, but, if it lays down the rule as contended, that the market value is the price at which a prudent seller would sell upon the customary terms of payment, we do not agree with it.

The court gave the jury the correct rule to follow in ascertaining and assessing the defendant's compensation, and properly refused her requested instruction.

The court's ruling on the evidence was likewise correct.

The defendant has excerpted from the following instruction that part in parentheses and says the court, after laying down the correct rule for determining the market value of the property, "construed that rule to mean what the particular parties would probably have arrived at by such negotiations" as the market value, which she says is not correct:

"Market value of land is the price it would probably bring after fair and reasonable negotiations where the owner is willing to sell but not compelled to do so and the buyer is willing to purchase but is under no necessity of buying the property (so you see in determining market value as of December 18th, 1930, you cannot say that the defendant has this land and may keep it as long as she wants to and therefore is entitled to obtain whatever price she desires to receive for it, nor must you say that the city must have this land and therefore it ought to obtain it at a low price. Those things you must not consider, but you must look at it just as though the defendant on December 18th, 1930, were willing to sell at the highest price which it was possible for her to obtain for

the land and that the city wanted to buy it at the lowest price which it was possible for the city to purchase it for and that the two parties came together and finally after reasonable negotiations worked out an understanding and agreement and the price at which the land is to pass to the city, that is, the price which the city must pay to the defendant for the land is the reasonable—I will leave out the word 'reasonable'—I say is the market value thereof as I have defined that term to you).''

''The rule,'' as defendant says, ''is what an ordinary seller and an ordinary buyer would probably have arrived at as a fair price under such circumstances.'' We think what the court did was to place the plaintiff and defendant before the jury in the position of an ordinary seller and an ordinary buyer, and state that the price they might agree upon under the circumstances was the land's market value. This illustration, by the concrete facts of the case instead of a supposititious case, could not, in view of all the instructions, have misled the jury.

We are of the opinion no prejudicial error was committed, and the judgment is affirmed.

LOCKWOOD and McALISTER, JJ., concur.