### CITY OF HOUSTON
#### v.
#### Marion S. CHARPIOT et al.
#### No. 12977.

Court of Civil Appeals of Texas.

Galveston.

May 3, 1956.

Rehearing Denied June 21, 1956.

Geo. D. Neal, City Atty., and Homer T. Bouldin, Sr., Asst. City Atty., Houston, for City of Houston.

Hofheinz, Sears, James & Burns, Will Sears and Robert L. Burns, Houston, for League of Texas Municipalities, Texas City Attys' Ass'n, and Hofheinz, Sears, James & Burns, Houston, amici curiae in support of appellant's motion for rehearing.

Bates, Riggs & Singleton and John Singleton, Jr., Houston, for appellees.

GANNON, Justice.

This suit originated on the petition of Marion S. Charpiot et al. as owners of a certain 217.87 acre tract of land on the San Jacinto River in Harris County to recover damages for waste worked on said land by Wade Lahar Construction Company and to enjoin further damage thereto. Wade Lahar Construction Company, it appeared, had entered on the land as a clearing contractor under the City of Houston and had commenced, but without right or authority from the owners, the clearing of the land preparatory to its flooding as a part of a lake or reservoir to result from the erection by the City of Houston of a dam on the San Jacinto River.

Appellant City of Houston, as authorized by Article 3269, V. A. T. S., intervened, alleging itself to be the real party at interest and sought condemnation of 122 acres, more or less, of plaintiffs' tract, including all of the tract bordering on the river. Thereaft-

er Wade Lahar Construction Company was dismissed and the case proceeded purely as a district court condemnation solely between City of Houston, as condemner, and appellees, as condemnees.

Trial was to a jury. The case was submitted on one special issue which, with explanatory definitions, is as follows:

Special Issue No. 1.

"What do you find from a preponderance of the evidence was the reasonable market value of the surface estate of the 117.78 acre tract of land involved in this suit on March 1st, 1953.

"Answer by stating the total amount in dollars and cents.

"In connection with the foregoing issue you are instructed that reasonable market value is the price the property will bring when offered for sale by one who desires to sell but is not obliged to sell and is bought by one who desires to buy but is under no necessity of buying it.

"You are instructed that by the term 'surface estate', as used in the foregoing Special Issue, is meant the surface of the land in question, exclusive of oil, gas and other minerals."

To this issue the jury answered $23,556. Thereafter the court rendered judgment divesting title to the surface estate of 117.78 acres of land out of the condemnees and vesting it in condemner, City of Houston. The judgment contained suitable provisions assuring the payment to condemnees of their constitutional compensation for the taking.

While the case was on trial, the parties entered into a stipulation evidently calculated to expedite and simplify the trial; still, at the same time, equally calculated to set at rest and in advance possible controversy which might arise between the parties after condemnation. The salient features of the stipulation are: (1) The City

reduced the acreage. it sought to condemn from 122 acres to 117.78 acres and agreed to condemn the surface estate only. (2) The City's right to condemnation of the surface estate of the reduced acreage in the district court proceeding was conceded, as was the City's compliance with all formal prerequisites to the taking. (3) The stipulation recites that "The sole issue for determination [in the proceeding] is the market value of the surface estate in the [117.78 acre] tract of land." (4) The condemnees agreed that concurrently with the payment to them by the City of the "constitutional compensation awarded by the court" they would execute and deliver to the City a certain general warranty deed in the form attached to the stipulation. We find nothing in the agreement which expressly or by necessary implication would bind the City to accept such deed. The deed would convey, subject to certain conditions, exceptions and reservations, the fee to the 117.78 acres—the reduced acreage to be condemned. Such conditions, exceptions and reservations were: Grantors' reserved (a) the use of so much of the surface area as might from time to time lie between the water's edge of the lake and the contour of the 45.0 foot elevation above sea level, (b) such riparian rights in the lake as they formerly had in the river, (c) the oil, gas and other minerals under the land, but with the right to prospect for and produce such minerals limited to such work as could be done so "as not to endanger, damage or pollute" the lake water—grantors binding themselves or successors to re-inject salt water, and to be liable for all damage to the dam or lake resulting from mineral exploration even without fault, (d) an easement to dredge a boat channel to provide access by boat to grantors' contiguous lands. By other provisions of the proposed deed, the City obtained the right, within specified limits, to flood certain contiguous lands of grantors, and grantors waived certain potential claims for damage to their contiguous lands. The deed recites the conveyance to be a "purchase".

Appellant's points on appeal are properly preserved. They are directed principally to the charge but appellant also complains of the refusal of the trial court to reopen the case to allow it to introduce further evidence after all parties had closed, and of the insufficiency of the evidence to support the verdict.

Appellant first assigns error to the trial court's definition of "market value". This followed in haec verba that suggested and once revised by the Commission of Appeals in an opinion adopted by the Supreme Court. State v. Carpenter, 1936, 126 Tex. 604, 89 S.W.2d 194, and 89 S.W.2d 979 on rehearing. Specifically, appellant objected to the definition because it would permit the jury to arrive at market value on the basis of a credit transaction rather than "the *price in cash* the property would bring." Appellant tendered and requested the court to submit a definition of market value identical with that given the jury except for the inclusion of the words "in cash" after the word "price". Had the jury been so instructed, they would have been limited to what the property would have brought in an all-cash "on the barrel head" transaction. They would not have been allowed even to value in cash, say, the present value of the consideration in a sale for part cash and part interest bearing notes well secured by the vendors and deed of trust liens. The tax laws and the difficulties of safely investing money being what they are, it is entirely possible that an owner willing to sell but under no compulsion to do so might insist on a substantially higher price for an all-cash sale than he would be willing to take for part cash and part well secured notes. This of course would not likely be true in a transaction involving movables, and for obvious reasons.

Appellant cites many Texas cases where courts have approved as correct definitions of market value in substantially the form of that requested by appellant, but none of the cases turns on or discusses appellant's point. In fact, neither party cites any case

which actually turns on or discusses the precise issue, and apparently there is no ruling Texas authority. We have located the following text in 29 C.J.S., Eminent Domain, § 137, page 974; "Although market value has been defined in terms of the amount obtainable at a sale for cash, other authorities define it in terms of the amount obtainable at a sale on the terms customarily prevailing in similar sales." Cited in support of the text are Mandl v. City of Phoenix, 1933, 41 Ariz. 351, 18 P.2d 271; Baucum v. Arkansas Power & Light Co., 1929, 179 Ark. 154, 15 S.W.2d 399, 401, and Matter of City of Buffalo, 1 Sheld. 408, 1 Buff. Super.Ct., N.Y., 408. We do not have access to the New York decision.

Mandl v. City of Phoenix, supra, is an out and out holding supporting appellant's position, while Baucum v. Arkansas Power & Light Co., supra, is an out and out holding contra. We consider the Arkansas case to be better reasoned.

In the Baucum case [179 Ark. 154, 15 S.W.2d 401], which was a condemnation proceeding, the trial court instructed the jury that condemnee was entitled to "the fair *cash* market value." On appeal, this instruction was assigned as error because of the inclusion of the word "cash" in defining market value. It appears from the opinion that the constitution of Arkansas, as does that of Texas, requires compensation in money for public taking. The court said:

"In other words, where one's land is taken in the exercise of the right of eminent domain he must have full and just compensation in money, and market value is the sum 'the land would be reasonably worth on the market for a cash price,' but the term cash price as here employed means a sum payable in cash, as contradistinguished from an exchange of properties. It does not mean that the entire purchase price should be paid in cash upon the delivery of a deed. A sale would be for cash within the meaning of this definition if made for a sum paid in money or for a sum paid and payable in money. For instance, A owns a farm which he is willing but not required to sell. B wishes to buy it but is not required to do so at an excessive price. A and B agree upon a price of $20,000, of which B pays in money $10,000, with balance payable in one year or other customary time, this balance being secured by a lien on the property itself, and bearing interest at a rate equal to the legal rate. If this security is such that the balance of the purchase price, with the interest thereon, can, in the usual and ordinary course of business, be certainly realized out of the property, the sale is for cash, because its equivalent will be realized.

It is a matter of common knowledge that farms are rarely, if ever, sold for a sum in cash laid down on the barrel head, and if the landowner is to be limited to such a sum as he could get when the entire purchase price is paid cash down, he would be deprived of the valuable right of having his property appraised according to the custom and usage in selling farm lands. Cash value simply means money value, the value payable in money, as distinguished from a price which would be employed as the basis of an exchange. It would be a sale for cash, as the term is employed in eminent domain cases, if the sale was for the equivalent of cash.

"We do not reverse the judgment because this instruction was given, but, in view of the specific objection made to it, the court should have defined the term 'market value' as herein defined without the addition of the word 'cash.' In other words, there should have been no implication in the instruction, in view of the specific objection made, that the market value could not exceed the sum which the owner could obtain for cash counted out and paid down.

"Of course, the market value, when thus ascertained, must be paid in money but this is true because the Constitution has provided that it is upon this condition that the right of eminent domain may be exercised. There is no element of contract in the exer-

cise of this right. Indeed, it is ordinarily exercised only when, as in the instant case, the parties have been unable to agree—to contract. In such a case the compensation guaranteed the owner by the Constitution must be paid in money, but the market value is arrived at by determining what one who is willing but not required to sell will take and what another who is willing but not required to buy will give, that sum being payable in cash when paid in accordance with the custom prevailing in similar sales."

■ Appellant does not, by its request, seek to limit the term market value to the value "in money" of what could be realized from a sale on terms common to real estate transactions. It insists on limiting condemnees to an all-cash sale. In our opinion, this would have been too restrictive and would have denied condemnees their right to the value in money which they could have realized from a fair sale on other than an all-cash basis. How such a restricted basis of sale would operate in every case is not clear. However, it is clear that it would be calculated to limit severely the number of desirable bidders and hence the realization of the full value of the land in money. We overrule appellant's point.

Appellant next complains of the court's definition of "surface estate", contending on a basis wholly obscure to us that the definition permits the jury to allow for the "market value of the fee simple title to the land instead of the surface estate only of said land." Appellant additionally complains that the court erred in refusing to define surface estate as requested by it, as follows:

"By 'surface estate' as used in the foregoing Special Issue is meant all rights in and to the 117.78 acre tract of land except all of the oil, gas and other minerals in and under said land which are reserved to the Plaintiffs with the limitation that Plaintiffs shall not drill upon or develop for any minerals on the surface of such land unless such drilling, exploration and production is so conducted as not to endanger, damage

or pollute the Reservoir or source of water supply, and except that the sole and exclusive use of the area within said land that may from time to time lie between the water's edge and the contour of 45.0 feet elevation above mean sea level and the right of access to the river or Reservoir across the same as the case may be is reserved to the Plaintiffs and the riparian rights which Plaintiffs had in the river are reserved for Plaintiffs in the Reservoir."

■ It is clear, we think, that the requested definition is a somewhat partisan and onesided effort to sum up the provisions of the deed favorable to condemnees, which condemnees agreed—apparently at the option of the City—to deliver to the City, but the agreement was that the deed was to be delivered only after the City had proceeded to condemn the surface estate to the 117.78 acre tract and had acquired full and unlimited title to such surface estate by condemnation and had made payment to condemnees of the constitutional compensation for such estate. The parties—wisely, we think—did not agree to inject into the condemnation proceeding the give and take —the quid pro quo—understandings to be evidenced by the deed. The record does not show the delivery and acceptance of the deed. It may never be delivered, or, if tendered, accepted by the City. We find nothing in the record which would bind the City to accept it. Neither the stipulation nor the accompanying form of deed was read to the jury. It is true, the judgment includes in substance the provisions of the proposed deed but apparently this was by agreement arrived at *after the verdict.* There is nothing in the written stipulation entered into during the trial which would bind the City to the inclusion in the judgment of any of the provisions of the proposed deed. On the other hand, the stipulation leads to the thought that the judgment was to be for the vesting in the City of the surface estate without limitation or dominant easements of any kind. The trial was conducted on that basis and as we have pointed out, the jury was never apprised

of the contents of the stipulation or the deed. But conceding arguendo that the damages should have been assessed by the jury in relation to the terms of the deed, this would require presentation to and consideration by the jury of *all* of the terms of the deed, not just those included in the requested instruction which failed to incorporate any reference to valuable rights to be acquired by the City under it, namely, the right to inundate to some extent condemnees' contiguous lands, including the right to police such land, the release of potential damage claims, and the absolute right to hold an owner of the mineral estate liable for all damages flowing from mineral exploration regardless of fault. It is plain to us that appellant's requested definition of surface estate, as applied to the instant record, was in any view neither complete nor substantially correct and that as prepared the instruction was highly improper and one-sided, and therefore prejudicial to the just rights of condemnees. We find no error in the refusal of the requested instruction or in the court's definition of "surface estate", on any basis assigned.

■ The refusal of the court to reopen the case for the introduction of evidence by appellant after all parties had closed, or, as the trial court put it, "irrevocably rested", is assigned by appellant as abuse of discretion. We have reviewed the record as it shows the material facts bearing on the trial court's action and are convinced that no abuse of discretion is shown. This is especially true since there is no bill or other showing of the probative force of the evidence which appellant says it was denied the privilege of offering, i. e., the testimony of the Harris County Deputy Tax Collector relating to the rendition of the property by condemnees for the year 1953. What such testimony would have been is not disclosed. For ought the record shows, such testimony might have tended to bolster condemnees' claims of value. We could not reverse in any event on the speculation that such evidence might have been helpful to the City.

■ Appellant assigns the complete want of any evidence to sustain the finding of the jury in answer to the one special issue submitted. There was no timely objection to the court submitting the issue but apparently such an objection is no longer required to raise the point of no evidence on appeal. Myers v. Minnick, Tex.Civ.App., 187 S.W. 2d 941. We are constrained to overrule appellant's point. Three properly qualified witnesses testified to values based on surface uses entirely, which would have justified a much higher verdict than the approximately $200 per acre value found by the jury. The testimony of such values ranged from $1,250 per acre (Charpiot) to $800 per acre (Lee and Peckinpaugh).

Finally, appellant says the verdict is contrary to the overwhelming weight of the evidence. Though its witnesses testified to values of only $40 per acre (Eversburg) and $45 per acre (Pounds), we find the verdict to be amply supported by the evidence.

Affirmed.

## On Motion for Rehearing

The appellant City of Houston has filed a motion for rehearing consisting solely of formal "Points of Error on Rehearing" without submitting argument or discussion in their support.

However, the League of Texas Municipalities, the Texas Cities Attorneys Association, and the law firm of Hofheinz, Sears, James & Burns have sought and obtained leave to file an amicus curiae brief and argument urging that our holding with respect to "market value" is contrary to settled Texas law. The amicus curiae presentation is an able and exhaustive one.

It is claimed that our holding is contrary to prior holdings of the Supreme Court, of other Courts of Civil Appeals, and of our own Court in the following cases: McInnis v. Brown County Water Imp. Dist. No. 1, Tex.Civ.App. Austin 1931, 41 S.W.2d 741, error refused without qualification; McInnis v. Brown County Water Imp. District

No. 1, Tex.Civ.App. Austin 1931, 45 S.W.2d 1118, error refused without qualification; Ft. Worth & D. N. Ry. Co. v. Sugg, Tex. Civ.App. Amarillo 1934, 68 S.W.2d 570, no writ history; West Texas Hotel Co. v. City of El Paso, Tex.Civ.App. El Paso 1935, 83 S.W.2d 772, error dismissed; King v. Mc-guff, Tex.Civ.App. Galveston 1950, 229 S.W. 2d 188, reformed to eliminate recovery of exemplary damages, and affirmed 1950, 149 Tex. 432, 234 S.W.2d 403.

West Texas Hotel Co. v. City of El Paso was a tax case and we do not consider it applicable. For reasons which appear from the face of the opinion, we also feel that King v. McGuff is inapplicable; however we are convinced that our holding is not to be reconciled with the holdings in the two McInnis cases or with that in Fort Worth & D. N. Ry. Co. v. Sugg, the latter being based apparently on the former cases.

The McInnis cases were companion suits and the second of these was decided on the basis of the opinion in the first which is reported in 41 S.W.2d 741, 746. The outright refusal of a writ of error by the Supreme Court in these cases amounts to an adoption by the Supreme Court of the opinion as well as the judgment in the two cases so as to give what is said in the opinion of the Court of Civil Appeals the force and effect of Supreme Court law.

In the McInnis cases the trial court defined the market value of the property there involved as " 'the price which it will bring *in cash* when offered for sale by one who desires to sell, but is not obliged to sell, and is bought or purchased by one who desires to purchase it, but is under no necessity of doing so.' " The Court of Civil Appeals observed that this definition of "market value" accords generally with accepted definitions in condemnation cases, and stated that the rule in Texas was not otherwise.

Coming to the precise objections urged against the definition, to wit: the use in it of the words "in cash" the court said: "While the particular question does not appear to have been often raised, we find the expressions 'market value,' 'fair market value,' 'cash market value,' and 'fair cash market value' used synonymously throughout the reports. See Baucum v. Arkansas Power & Light Co., 179 Ark. 154, 15 S.W. 2d 399; State v. Woodward, 208 Ala. 31, 93 So. 826, 827; from the latter of which we quote: ' "Cash" is the antonym of "credit." * * * The phrase "actual cash value" is practically synonymous with "fair cash value" (and means) the price it (property) will bring in a fair market. * * * A sale on credit would * * * have a tendency "to increase the number of bidders and to enhance the price." And that enhancement would vary ad infinitum according to the minitude of the cash payment and the magnitude and duration of the credit.' "

While it is true that the court cites Baucum v. Arkansas Power & Light Co., 179 Ark. 154, 15 S.W.2d 399, it is also true that the court actually quotes from the Alabama case of State v. Woodward, 208 Ala. 31, 93 So. 826, apparently with approval. The court does not undertake to deal with the objection urged to the charge in language of its own, but we take it the quotation from the Alabama case is to be given greater weight than the citation of the Arkansas case and that as between the divers holdings of the two cases we are to assume that the Austin court intended to follow the reasoning of the Alabama case, and that a similar intention is to be imputed to the Supreme Court by its refusal of a writ of error. This being true, it is not to be gainsaid that the clear implication of the quoted language of the Alabama case is that credit sales, or sales partly for cash and partly for credit, are not to be taken into consideration in determining market value in condemnation cases. If this analysis be correct, and we think it is, then our holding is in conflict with a prior holding of the Supreme Court on the same question, and it is withdrawn. Our function as an intermediate court of appeals is not to anticipate growth and change in the law so as to keep it in step with changing

times and modern conditions, at least not to the extent of arriving at a result contrary to what has been previously decided on substantially the same question by the Supreme Court. That is peculiarly the prerogative and function of the court of last resort.

Much has been written on fair value, market value, fair market value, cash market value, etc. We apprehend that much of the confusion in the cases on the precise point before us stems from a failure to recognize an obvious distinction between a price in cash, that is to say a sale for cash money in an on-the-barrel-head transaction, and the value in cash of whatever consideration one may be able to realize from the sale of land based on a sale for part cash and part secured credit which is the basis of sale in the vast majority of land transactions. If one can realize, say, only $800 from a cash sale of land, but could realize $1,000 payable $500 in cash and $500 by a well secured note from a sale of the same land, which note, for illustration, would have a market value immediately upon execution and delivery of $400, no reason occurs to us in fairness or justice why a condemnee should be limited in his money compensation to an $800 figure rather than to the $900 total money value of his land on a sale partly for cash and partly for credit. However, as we have already pointed out, if the law as apparently declared in McInnis v. Brown County Water Imp. Dist. No. 1, supra, is to be altered and changed to put it in step with modern conditions where credit is the very life blood of the business world, that amendment and change will have to come about through Supreme Court action. It is beyond our right and power. We do observe in passing, however, that since 1931, the date of the McInnis decision, and the present there has occurred a vast change in the function and use of credit in ordinary commercial transactions so that cash no longer commands the respect it once did. We also observe in passing that the effect of the tax laws on the desirability or lack of it of cash transactions from the standpoint of a seller is vastly different today than in 1931. In 1931 it was inconceivable that one would prefer a deferred payment to a cash transaction. That in many instances is no longer true. In recent times it has not been uncommon even for automobile paper to be bought at its full face value. See our recent opinion in Mossler Acceptance Company v. Tips, 289 S.W. 2d 295.

We have said we do not consider West Texas Hotel Co. v. City of El Paso, supra, applicable because it is a tax case. The point is the question decided there really turned on the construction of tax statutes which refer to "reasonable cash market value", Art. 7211, V.A.T.S., and to "cash value, the market value of such property," Art. 7214, V.A.T.S. The same is true of the Alabama case of State v. Woodward, supra, on the authority of which the McInnis cases were decided. There the court was construing an Alabama tax statute which provided for the assessment of property at " 'its fair and reasonable cash value.' " Gen.Acts 1919 Ala. § 7, pp. 282, 287. We perceive there may be a distinction between tax cases where only uniformity and equal protection of the laws is concerned, and condemnation cases where just compensation must under the Constitution be the rule of decision. Many considerations would support a valuation, based on a cash price for determining a tax base. Such a classification of property would not be unreasonable. But that is not necessarily to say that the same considerations would justify the taking of private property for something less than the real or actual present cash value thereof. That is to say the value in cash or money of whatever consideration the condemned property would bring on the market. This may or may not explain the absence of the word "cash" in Article 3265 providing a rule of damages in eminent domain cases. It is there set out that the damages "shall be the market value of the property." There is no reference in Article 3265 to "*cash* market value" such as is found in our own taxation stat-

utes under which West Texas Hotel Co. v. City of El Paso was decided, and in the Alabama statute under which State v. Woodward was ruled.

If, as we have held, the trial court erred, under the ruling in the Brown County Water Imp. Dist. case, in refusing to include the words "in cash" in its definition of market value, this brings us to the question of whether such refusal constitutes reversible error. It probably would under the abandoned rule of Bell v. Blackwell, Tex.Com.App., 283 S.W. 765, but under the present harmless error rule before we can reverse we must be able to say, not only that error was committed, but that the error was one which was calculated to prejudice and probably did prejudice appellant in the end result. From a review of the record, we are unable to reach such a conclusion.

All of the valuation witnesses for appellees stated their opinions of "market value." The City's witnesses testified to their opinions of "cash market value." In the presentation of the case to the jury and in the examination of the witnesses, no point was made by the parties of any distinction between "market value" and "cash market value" nor was any evidence adduced by any party indicating that the opinion of any expert witness on market values was based on other than a cash transaction. In fact, there is no way to determine from the record whether appellees' witnesses did or did not take into consideration, in arriving at their estimate of market values, sales other than sales for cash. In this state of the record, we are unable to see how appellant has been prejudiced by the refusal of the trial court to give its requested definition of market value since there was no evidence before the jury to indicate that appellees' witnesses, in expressing their opinions of market value, were taking into consideration any sales other than cash sales, and if, as is stated in the Brown County Water Imp. Dist. case, the expressions " 'market value,' " " 'fair market value,' " " 'cash

market value,' " and " 'fair cash market value' " are synonymous, then it follows, in the absence of some indication to the contrary, that appellees' witnesses must have had in mind only cash market value. If this be correct, then there was no evidence in the record of any market value other than the cash market value, and we must presume that the jury determined the case alone on the basis of the evidence before it. There is no indication or proof that the jury went outside the record to consider other and higher values than those testified to, i. e., values which might have been realized from credit as distinguished from cash transactions.

Appellant's motion for rehearing is refused.