576 P.2d 1366

**Simon MASTICK, a single man, individually, and Louis L. Mastick, husband of Lupita Mastick, as his sole and separate property, Individually, and as co-trustees and trust beneficiaries of that certain Trust dated January 3, 1972, and recorded in the Santa Cruz County Recorder's Office in Docket 138, page 285; Maria Mastick aka Maria Matejchich, a widow, Individually and as trust beneficiary under that Trust dated January 3, 1972, and recorded in the Santa Cruz County Recorder's Office in Docket 138, page 285, Appellants,**

**v.**

**The STATE of Arizona, Appellee.**

**No. 2 CA–CIV 2533.**

Court of Appeals of Arizona, Division 2.

Jan. 30, 1978.

Rehearing Denied March 9, 1978.

Review Denied April 4, 1978.

Lawrence P. D'Antonio, Tucson, for appellants.

Bruce E. Babbitt, Atty. Gen. by James R. Redpath and John L. Jones, Asst. Attys. Gen., Phoenix, for appellee.

## OPINION

HOWARD, Judge.

This is an appeal from a judgment in an eminent domain proceeding. The record shows that prior to 1966 the subject property was part of a larger parcel which was bisected north to south by Highway U.S. 89. In 1966 in connection with the construction of Interstate Highway I–19, a controlled

access highway, a condemnation action was filed by the State. At the trial of that action one of the property owners, Simon Mastick, testified that as a result of the construction of I–19 the subject property in the before situation was worth $4,000 per acre, but was worth only $400 per acre in the after situation.

On June 25, 1975, the State of Arizona filed a condemnation action seeking to condemn a portion of the subject property for construction of a truck by-pass route to downtown Nogales. The before situation of the subject property in this case is the after situation of the subject property in 1966. In the before situation the subject property was bisected east to west by an access road leading to I–19. However, both parcels of land had physical access to this road. In the after situation the new truck route bisects the property east and west and at 20 feet above the grade of the northern parcel. One can no longer go from one parcel to the other as in the before situation. It was stipulated at trial that the State of Arizona would provide direct access to the new truck route for the northern parcel via a turn-out. The southern parcel, however, has no direct access to the new truck route but there was testimony that the State would allow the property owners access across a portion of state-owned land to an access road leading to the new truck route.

Appellants presented testimony showing the total damages to be between $856,000 and $1,094,200. The State's appraisers testified the total damages were between $11,175 and $66,687.

The case was tried to a jury which awarded appellants $27,000 for the 5.4 acres of land taken by the State and severance damages in the sum of $48,000.

In this appeal we are presented with six questions for review.

## ADMISSIONS OF A LANDOWNER AS TO VALUE

■ Appellants contend the trial court erred in permitting the State to introduce the testimony of Simon Mastick from the 1966 condemnation case because it was too remote. We do not agree. This testimony constituted an admission as to the value of the subject property in the before situation. A statement of value by the owner, to be competent as an admission, must have been made sufficiently near in time to the date of the taking to be reasonably helpful to the jury. *Central Branch U. P. R. Company v. Andrews*, 37 Kan. 162, 14 P. 509 (1887); 5 Nichols' The Law of Eminent Domain, 3rd Ed. § 18.6 (1975). Much must be left to the discretion of the trial court in determining whether the time was too remote or the conditions too dissimilar to make the evidence available. *Patch v. City of Boston*, 146 Mass. 52, 14 N.E. 770 (1888). As is the case of the admissibility of a previous sale of the subject property, no hard and fast rule can be laid down. For example, in *Southern Electric Generating Company v. Leibacher*, 269 Ala. 9, 110 So.2d 308 (1959) the previous sale of the property was ten years prior to the date of valuation but still held to be admissible.

Here there was testimony that the same physical condition upon which Mr. Mastick based his testimony in the previous action still existed on June 25, 1975. Appellants' own appraisal witness testified that property values in the Nogales area had doubled since 1966, thus giving the jury a basis upon which to judge a value increase. Furthermore, this witness himself used a 1966 comparable sale in forming his evaluation opinion. We are unable to say the trial court abused its discretion in admitting this testimony.

## THE STRIKING OF EXPERT TESTIMONY

■ Testifying on behalf of appellants was Mr. Timothy Weil, a licensed real estate broker in the states of Arizona, California and Texas. He is primarily a shopping center developer. His expertise includes the acquisition of shopping center sites. He has experience in valuing shopping center sites and has participated as a broker in the sale of these sites. His opinion as to the before value of the subject

property was based upon his experience in purchasing and developing a shopping center site on Highway U.S. 89 in Nogales. He believed the highest and best use of the subject property in the before situation was a shopping center site and it was his experience that a profitable shopping center could not be developed if one paid over $1.00 per square foot. He was then permitted to express a value for the property in the before situation based upon what he would be willing to pay for it as a shopping center developer. He could not give any opinion as to what the price of the property would be on the open market. He also expressed an opinion as to the after value of the subject property but admitted on cross-examination that he had no real basis for his opinion since the property had no commercial value in the after situation and his expertise went only to the valuation of commercial properties.

The trial court granted the State's motion to strike Mr. Weil's opinion of the subject property in the after situation. Appellants claim this was error. The State contends that not only was the trial court correct in granting the motion, but it should never have permitted Mr. Weil to give an opinion as to the value in the before situation. We do not decide whether the trial court erred in permitting Mr. Weil to testify as to the before value of the property. We do, however, call attention to the case of *Indianapolis & Cincinnati Traction Company v. Wiles*, 174 Ind. 236, 91 N.E. 161 (1910) wherein the trial court held that a witness cannot testify concerning what he would pay for the land since damages were to be determined by a fair market value and not by what a witness would be willing to pay for it. As to striking Mr. Weil's testimony, since he testified that he had no expertise in the valuation of the property in its after situation, the court did not err. *Board of Regents of the University and State Colleges of Arizona v. Cannon*, 86 Ariz. 176, 342 P.2d 207 (1959).

## THE STATE'S APPRAISAL TESTIMONY

Appellant contends that the trial court erred in failing to strike the valuation testimony of the State's two appraisers. Prior to putting on the testimony of these two witnesses the State presented evidence that the subject property suffered flooding problems in the before situation which would cost $211,776 to cure before the property could be put to its highest and best use.

Mark Klafter, the State's first appraisal witness, testified that the highest and best use of the subject property in the before situation was for investment purposes with future commercial use. As for the before value, it was his testimony that if the entire 32.9 acres of property were usable, its fair market value would be $20,000 per acre or a total of $658,000. Although he noted that it would cost $211,776 to make part of the property worth $20,000 per acre, he did not use that cost to cure figure in arriving at his before valuation. State's exhibit No. 45 shows that in arriving at the before value he valued 17.8 acres of the subject property as if the deficiencies had already been cured, to-wit at $20,000 or a total of $356,000 and valued the balance of 15.1 acres, which he considered unusable because of flooding problems, at $1,000 per acre or a total of $15,100. His before value of the subject property was therefore $371,100.

The 5.4 acres taken by the State were located in the area which Mr. Klafter considered unusable washland and worth only $1,000 per acre. However, when considering the value of the part taken he did not value it at $1,000 per acre but instead divided the total before value of $371,100 by the total acreage of the subject property which resulted in a value of $11,280 per acre for the 5.4 acres taken or a total of $60,912.

In the after situation Mr. Klafter was of the opinion that although the value of the remainder was not changed, if it would cost more than $211,776 to reclaim the land the difference would be the damages to the remainder. Since there was testimony that if one were to make the land usable in the after situation instead of expending the cost in the before situation, such cost would amount to $217,551, Mr. Klafter subtracted

$211,776 from $217,551 and found the damages to the remainder to be $5,775.

Appellants moved to strike all of Klafter's testimony except ". . . his testimony that the value before per acre was $20,000 and the total value for the entire parcel before was $658,000, . . ." They also moved to strike exhibit No. 45. There were two grounds stated for this motion: (1) Klafter's testimony was based on an assumption that there was a flood problem, and (2) his testimony was not based upon the condition of the land as it was but instead, upon its value after improving it. The trial court denied the motion. Appellants claim this was error. We do not agree.

■ The appellants are entitled, inter alia, to the fair market value of the property taken by the State. The fair market value is the highest price estimated in terms of money which the land would bring if exposed for sale in the open market with reasonable time allowed in which to find a purchaser, buying with knowledge of all the uses and purposes to which it was adapted and for which it is capable. *Mandl v. City of Phoenix*, 41 Ariz. 351, 18 P.2d 271 (1933); *Department of Revenue v. Transamerica Title Insurance Company*, 117 Ariz. 26, 570 P.2d 797 (App.1977). The date of valuation is the date of the summons and fair market value at that time is the measure of compensation and damages. A.R.S. § 12–1123(A). The relevant inquiry here was, what was the fair market value of the subject property on June 25, 1975 and what damages, if any, were suffered by the construction of the new truck route as measured by the difference between the value of the remainder before and after the taking and construction? *Haney v. City of Tucson*, 13 Ariz.App. 296, 475 P.2d 955 (1970); *Defnet Land & Investment Co. v. State ex rel. Herman*, 14 Ariz.App. 96, 480 P.2d 1013 (1971).

Let us put our mythical buyer from the definition of fair market value on the land on June 25, 1975. He knows that there is a

flood problem and he knows that it will cost $211,776 to cure it so that the land can be put to a highest and best use. It is not unreasonable to assume that he would take into account the $211,776 in arriving at the price he would be willing to pay for the property.

Appellants' motion to strike demonstrates their confusion as to Klafter's testimony. He did not testify that the before value of the property was $658,000. That figure was applicable only if all 32.9 acres of the property were usable. He testified that only 17.8 acres were usable. His before value was $371,100 which comprised usable and unusable land. There were errors in Klafter's methodology, but they were in favor of the landowner. For example, he valued the 17.8 acres at $20,000 per acre, a value which would accrue only if $211,776 were expended; yet, he failed to deduct this amount from the total value of the 17.8 acres which would presumably result in a figure a mythical buyer would pay for those 17.8 acres knowing that he would have to expend the aforementioned sum. This error was compounded when he allowed $11,280 per acre for the part taken, a figure arrived at by averaging, although he had previously valued it as part of the whole at $1,000 per acre.[1]

■ In any event, the court did not err in denying the motion to strike exhibit No. 45 or Mr. Klafter's testimony since both the exhibit and Mr. Klafter's testimony embraced evidence which was admissible as well as inadmissible and the motion was directed against the entire exhibit and all of his testimony with the previously noted exceptions. *City of Tucson v. Transamerica Title Insurance Company of Arizona*, 26 Ariz.App. 42, 545 P.2d 1004 (1976).

Robert Francy, who was the State's second appraisal witness, also believed that the expenditure of $211,776 was necessary to put the property to its highest and best use in the before situation. He testified that if that sum were to be expended the

1. His valuation of $1,000 per acre for the washland was a proper method of valuation. See *Arizona State Land Department v. State ex rel. Herman*, 113 Ariz. 125, 547 P.2d 479 (1976).

fair market value of the property in the before situation would be $379,700, but that in order to arrive at the fair market value of the property in the before situation he had to deduct the sum of $211,776 thus arriving at a before value of $167,924 which included 15.1 acres of washland valued at $1,000 per acre. The taking of 5.4 acres was from the washland the value of which was unaffected by the addition or subtraction of the $211,776. Francy found the fair market value of the land taken to be $5,400.

Francy followed the same procedure in arriving at the after value of the property. He felt that in order to put the property to its highest and best use in the after situation, $217,551 would have to be expended and therefore found the value of the property in the after situation to be $156,749. This sum, subtracted from the before value of $167,924 left a difference of $11,175 which represents the sum of $5,400 for the part taken and damages of $5,775 to the remainder.

█ Appellants moved to strike the entire testimony of Mr. Francy including the exhibits which illustrated his valuation testimony. The basis for the motion was the same as in the motion to strike Mr. Klafter's testimony. We do not believe the court erred in denying this motion to strike. As we have previously stated, the amount of money which is necessary to be expended to put the property to its highest and best use is relevant in determining what price a knowledgeable buyer would pay for the property. Contrary to appellants' contention, Mr. Francy did not value the land in either the before or after situation as if the sums of money had already been expended. He arrived at a value, both before and after, as the property existed on the date of the summons.

## SURPRISE TESTIMONY

█ The State's amended complaint stated, inter alia:

"The Defendant's remaining land in said SE ¼ of the SE ¼ of Section 6 and the NE ¼ of the NE ¼ of Section 7 shall have no right or easement of access in or to the limited access highway to be constructed over and upon the right of way described above; *provided, however, that said land shall have such access rights as are set forth in that certain Final Order of Condemnation recorded in Docket 102 at page 548 records of said County.*" (Emphasis added)

On the first day of the four-day trial the State's senior resident engineer was being cross-examined by appellants' attorney. The following took place:

"Q. That is true also of the parcel to the north, the second parcel; in the after condition it no longer has any access from Route 187? [Route 189]

A. I can't stipulate to that. Access is permitted by the State under 17 + 60.

Q. After it is constructed, what the State will do in the future is something that may be your counsel will tell us about.

A. It is being permitted.

MR. REDPATH: At this time—this would be an appropriate place to stipulate that if application were made for permit a turnout would be made directly from the—

MR. D'ANTONIO: If Counsel is going to stipulate, that is part of the record?

THE COURT: Yes.

Q. What Counsel stated, if Counsel would ask for a permit for access to the highway you will give them a permit for a turnout, is that correct, and that turnout has to be somewhere adjacent to the Mastick property and still be adjacent to 187? [189]

A. Yes.

Q. Would you look at the plans and tell us—you can't make a turnout on the bridge, can you?

A. No.

Q. So you have got to get past the bridge. How many feet are level for this turnout?

A. Between the bridge and the Mastick property line?

Q. Yes?

A. It is really 200 feet, a little over.

Q. Then you have got to come down 20 feet, is that correct?

A. Yes.

Q. Somebody has to build that?

A. Yes.

Q. The State does not build it?

A. Ordinarily, no.

Q. The property owner has to build it?

A. Ordinarily.

Q. You say 'ordinarily'. You know the State isn't going to build it. The property owner must build it, isn't that correct?

A. Correct.

Q. And the State is going to tell the property owner, 'If you do build it, you will build it according to the State's specifications'?

A. Absolutely.

Q. The State may require them to build a steel bridge or whatever? They are going to determine the grade?

A. Design is left to the property owner, only it has to be compatible with what the State will propose.

Q. What grade will you permit in this turnout?

A. In this area you can get by with a fairly steep grade. Sixteen percent isn't unknown in the Nogales area.

Q. Sixteen degrees is what you can call steep. You would have to negotiate it in quite low gear. The hill adjacent to the courthouse is maybe 16 or 17 degrees; is that the kind of hill you are taking about?

A. Yes.

Q. In order to service that grade in order to get onto the Mastick property, how much of a link would you need?

A. Twenty percent, 16 percent—you would need over 100 feet, maybe 130, just to accomplish the grade difference.

Q. That would take you 130 feet into the property?

A. This could be part of the right-of-way out too.

Q. This is the type of access the Mastick could look forward to if he gets a permit to get access to that highway?

A. Yes, sir.

Q. You will admit that is a lot different than the access he had in the before condition?

A. Yes."

The State also filed a written stipulation on the third day of trial in furtherance of its oral stipulation previously set forth.

On their motion for new trial or additur appellants claimed they were surprised by the testimony and stipulation. Attached to the motion was the affidavit of an engineer which stated that it would cost $50,000 to construct a ramp into the northern parcel. Appellants claim the trial court erred in denying their motion. We do not agree.

It seems clear from the wording of the amended complaint that some type of access to the new truck route is permitted; to-wit, the access rights which are contained in the Final Order of Condemnation recorded in Docket 102 at page 548, in the office of the Santa Cruz County Recorder.[2] At the very least the pleadings put counsel on notice and by means of discovery the nature of the access rights would have been revealed. However, appellants did not file a single interrogatory or take a single deposition, and there is nothing in the record to suggest that the rights set forth in the recorded order are inconsistent with the engineer's testimony and the State's offered stipulation. Surprise cannot be claimed under such circumstances. Furthermore, appellants did not claim surprise at trial, did not ask for a continuance to secure expert testimony and did not ask the State's engineering witnesses how much the cost of the ramp would be. Instead, as revealed in the cross-examination previously set forth, appellants proceeded on the theory that such a ramp would not provide satisfactory access.

2. The Final Order entered in the first condemnation action was never introduced into evidence. At oral argument appellants' counsel referred to the *judgment* in the prior case which was introduced, but they are not the same documents.

## FAILURE TO GRANT AN ADDITUR

■ Appellants, in addition to moving for a new trial, also moved for an additur on the ground that the jury verdict as to the value of the 5.4 acres was substantially lower than the lowest estimate of value which was testified to at trial. We do not agree. The jury awarded $27,000 for the 5.4 acres taken. The State's appraiser, Mr. Francy, testified that the value of the part taken in the before situation was $1,000 per acre or $5,400. It is clear that the jury's verdict was within the range of testimony.

## PAYMENT OF EXPERT WITNESSES' FEES

■ Appellants contend that the trial court's refusal to award them $10,300.84 for expert witnesses' fees violates Ariz.Const., art. 2, § 17 which provides in part:

> "No private property shall be taken or damaged for public or private use without just compensation having first been made . . . ."

This contention was decided adversely to the landowners in *State v. McDonald*, 88 Ariz. 1, 352 P.2d 343 (1960). The California Supreme Court recently had the opportunity to review this question in the context of attorney's fees on appeal in the case of *Holtz v. San Francisco Bay Area Rapid Transit District*, 17 Cal.3d 648, 552 P.2d 430 (1976). The court stated:

> "The established rule is that allowance of expert witness and attorney fees is not required by the just compensation clause of article I, section 19, of the California Constitution, and that the discretion to provide for award of these costs lies with the Legislature. [citation omitted]" 552 P.2d at 437.

Judgment affirmed.

RICHMOND, C. J., concurring.

HANNAH, Judge.

Respectfully, I dissent.

None of the state's pleadings and none of the pre-trial proceedings gave fair notice to appellants that they would still have partial access to the highway after the improvements were constructed or that the cost of obtaining that access would be pertinent. On the contrary, the state's complaint and amended complaint indicated that there would be no access from the property to the truck bypass.

The appellants had the right to rely upon the pleadings and could not reasonably have been expected to be prepared at trial for the issue of the very substantial cost of constructing an access ramp. They were under no obligation to conduct pre-trial discovery on a matter which was not in dispute. A motion for continuance when the issue suddenly arose, with the jury already impanelled and the trial in progress, would hardly have been an adequate remedy. The appellants were the victims of "[a]ccident or surprise which could not have been prevented by ordinary prudence", for which a new trial should have been granted in accordance with Rule 59(a)(3) of the Rules of Civil Procedure. Cf. *Ries v. McComb*, 25 Ariz.App. 554, 545 P.2d 65 (1976).

I am of the further opinion that the testimony of Simon Mastick at the 1966 condemnation trial involving another portion of the Mastick property was too remote, and, in view of the change in circumstances in the intervening years, was not relevant and was erroneously admitted by the trial court.

I would reverse and remand for a new trial.

NOTE: Judge JAMES D. HATHAWAY having requested that he be relieved from consideration of this matter, Judge J. RICHARD HANNAH was called to sit in his stead and participate in the determination of this decision.